Kenneth **ADAMS** et al., Plaintiffs,

v.

Elliot **L. RICHARDSON**, Individually and as Secretary of the Department of Health, Education, and Welfare et al., Defendants.

Civ. A. No. 3095–70.

United States District Court, District of Columbia.

Nov. 16, 1972.

As Amended Feb. 16, 1973.

Joseph L. Rauh, Jr. and John Silard, Washington, D. C., for plaintiffs.

Joseph Hannon, Asst. U. S. Atty., Washington, D. C., Robert Beale, Bateman, West & Beale, Newport News, Va., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This is a suit for declaratory and injunctive relief against the Secretary of Health, Education and Welfare and the Director of the Office for Civil Rights (OCR) of the Department of Health, Education and Welfare (HEW), complaining of alleged defaults on the part of defendants in the administration of their responsibilities under Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d et seq. (1970).

The responsibilities of the OCR include the administration and enforcement of HEW's regulation issued pursuant to Title VI and published at 45 C. F.R. Part 80. In addition, the OCR through agreement with other departments and agencies of the Executive Branch, had been assigned responsibility for Title VI enforcement with respect to most federal financial assistance to elementary, secondary and higher education and for health and social welfare activities, including such assistance as is granted and administered by those departments and agencies.

In an earlier proceeding, defendants' motion to dismiss or for summary judgment was denied in order to allow plaintiffs to engage in and complete discovery. Such discovery, *inter alia,* included a very lengthy deposition of defendant Pottinger.

Upon completion of discovery, plaintiffs filed a motion for summary judgment. Defendants have filed a combined motion to dismiss and a cross-motion for summary judgment. Both sides base their motions upon the entire record before this Court. On the basis of this record, it appears that, in certain of the areas about which plaintiffs complain, HEW has not properly fulfilled its obligation under Title VI to effectuate the provisions of Section 2000d of such Title and thereby to eliminate the vestiges of past policies and practices of segregation in programs receiving federal financial assistance. Our specific findings and conclusions are set forth below.

## FINDINGS OF FACT

A. *Higher Education*

1. Between January, 1969 and February, 1970, HEW concluded that the states of Louisiana, Mississippi, Oklahoma, North Carolina, Florida, Arkansas, Pennsylvania, Georgia, Maryland, and Virginia were operating segregated systems of higher education in violation of

Title VI. At that time HEW requested each of the ten states to submit a desegregation plan within 120 days or less.

2. Five states, Louisiana, Mississippi, Oklahoma, North Carolina and Florida, have totally ignored HEW's request for a desegregation plan and have never made submissions.

3. The other five states, Arkansas, Pennsylvania, Georgia, Maryland and Virginia, submitted desegregation plans which are unacceptable to HEW. Although the submissions were made between 18 and 36 months ago, HEW has failed formally to comment on any of these submissions.

4. As yet HEW has not commenced an administrative enforcement action against any of these ten states nor have these matters been referred to the Justice Department for the filing of suits against any of said ten states.

5. HEW has attempted to justify its failure to take administrative action on the grounds that negotiations with these ten states are still pending, that there are problems of great complexity in the segregation of state-wide systems, and that the Supreme Court standard of desegregation "at once" does not apply to public higher education.

6. HEW has advanced and continues to advance federal funds in substantial amounts for the benefit of institutions of higher education in said ten states.

B. *Elementary and Secondary School Districts—1970–71*

1. HEW has reported that as of the school year 1970–71, 113 school districts had reneged on prior approved plans and were out of compliance with Title VI. Some 74 of these districts are still out of compliance with Title VI.

2. Although HEW has known of the noncompliance of most of these districts since early in the 1970–71 school year, HEW has commenced administrative enforcement actions against only seven such districts, and of the eight cases referred to the Justice Department, only three have been sued.

3. HEW has attempted to excuse its administrative inaction on the grounds that it is still seeking voluntary compliance through negotiation and conciliation.

4. These non-complying districts have received and continue to receive substantial federal assistance from HEW.

C. *Compliance with Supreme Court Decisions*

1. In Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S. Ct. 29, 24 L.Ed.2d 19 (1969), the Supreme Court required desegregation "at once" of dual school systems in thirty Mississippi school districts. At the time of this decision (October 29, 1969), 87 school districts had HEW-approved desegregation plans which permitted segregation to be postponed until September, 1970. Despite the Supreme Court's directive, HEW took no steps to compel immediate desegregation in these 87 districts.

2. Following the decision of the Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), which enunciated "a presumption against schools that are substantially disproportionate in their racial composition" HEW identified 300 non-court order school districts with one or more schools composed mostly of local minority students.

3. Initially, HEW eliminated 75 of the 300 districts from further consideration without any on-site investigation or communication with the districts because in HEW's judgment the racial disproportion of the schools in these districts was too small to constitute a violation of *Swann*. HEW then eliminated 134 of the remaining 225 districts from further consideration still without any on-site investigation or communication with the districts. Although at least 85 of these districts have one or more schools substantially disproportionate in their racial composition, none was required to justify the substantial racial

disproportion in its schools. HEW mailed letters to the remaining 91 districts in the summer of 1971, notifying them that additional desegregation steps may be required under the *Swann* decision. Of these 91 districts, HEW received desegregation plans acceptable to HEW from 37 districts, noticed three for administrative hearing, and found *Swann* "not applicable" to nine.

4. Thus, 42 districts which HEW deemed to be in presumptive violation of *Swann* remain so approximately a year later while HEW continues to review them.

5. These 42 school districts have been receiving federal funds from HEW throughout this period of over one year.

D. *Vocational and Other Schools*

1. State departments of education in the 17 southern and border states administer or operate numerous vocational and other schools. In the latter category are schools for deaf, blind and mentally handicapped children.

2. While apparently not a complete list, HEW did provide the names of 205 vocational schools, 28 schools for the blind and the deaf and certain other schools for the mentally handicapped administered by the departments of education in the 17 states.

3. HEW does not have any student enrollment and faculty data by race for many of these schools but it did provide statistics of students and faculty in Louisiana's vocational schools which show seven schools as overwhelmingly black and 25 schools as overwhelmingly white. Many of the schools operated by state departments of education are obviously segregated.

4. Prior to the filing of this suit, HEW had no comprehensive program of Title VI enforcement for such schools.

5. After the filing of this suit, HEW announced a program to enforce Title VI with respect to state department-administered schools, but the program only affects vocational schools. As yet, HEW has scheduled no on-site reviews of the segregated vocational schools in the south.

6. Federal funds have been distributed to most of these schools for years and HEW continues to give such federal assistance.

E. *Districts Subject to Court Orders*

1. Some 640 school districts which receive HEW aid, including many of the largest school districts, are subject to school desegregation court orders in the 17 southern and border states.

2. Shortly after the passage of the statute in 1964, HEW issued a regulation which, in effect, deemed a district in compliance if it were subject to a final desegregation order and provided assurance that it will comply with said order including any subsequent modification thereof.

3. In 1968, Congress in amending § 2000d–5 of the statute, adopted the HEW regulation in part by providing that, for the purpose of determining whether an educational agency is in compliance with Title VI, compliance by such agency with a final court desegregation order shall be deemed to be compliance with said Title.

4. Once a school district has been placed under a court desegregation order and gives assurance "on paper" that it is in compliance with such order, it is the practice of HEW to regard such school district as in compliance with Title VI. HEW does not monitor said school districts to determine whether or not the court order is being obeyed.

5. HEW's justification for failure to monitor school districts under court order is allegedly based upon possible conflicts with the courts, possible conflicts with the Justice Department, and HEW's alleged lack of resources to provide systematic monitoring.

6. HEW has advanced and continues to advance substantial federal funds to school districts under court order.

**F. HEW's Record of Administrative Enforcement Proceedings**

1. Between the passage of the Civil Rights Act in 1964 and March 1970, HEW initiated approximately 600 administrative proceedings against non-complying school districts. In 1968 alone, HEW initiated about 100 enforcement proceedings. In 1969 HEW initiated nearly the same number of proceedings.

2. From March 1970, the month in which defendant Pottinger assumed the position as director of HEW's OCR, until February 1971, no enforcement proceedings were initiated, and since February 1971, only a small, token number of such proceedings have been commenced.

3. As a result of such enforcement proceedings, 44 school districts were subject to fund terminations in 1968–69. Only two cutoffs occurred in 1969–70. No termination of funds have occurred since the summer of 1970.

4. Upon initiating an administrative enforcement proceeding, it is the practice of HEW to defer the school district's application for "new" programs funds only. HEW does not defer its advancement of funds under "continuing" and previously-approved programs.

5. HEW makes no attempt subsequently to recapture funds distributed to a district between the notice of hearing and the formal determination of its Title VI ineligibility.

6. Since administrative enforcement proceedings generally consume one or more years, HEW's limited deferral practice allows the continued flow of large federal aid to the respondent school districts.

7. Despite defendants' reluctance or failure to employ enforcement proceedings terminating funds, substantial progress toward compliance with Title VI has been made. Since 1968 the number of Negro pupils in 100% minority schools or mostly minority schools in eleven southern states has greatly declined, decreasing from 68% of the total Negro pupils in the region in 1968 to 9.-2% in 1971–72. On the other hand, the number of said pupils in 51% or more majority white schools has substantially increased, rising from 18% in 1968 to 43% in 1971–72.

The basic issue presented for determination is whether defendants' exercise of discretion in relying largely on voluntary compliance to accomplish the progress achieved and to obtain compliance in the areas still unresolved meets their full responsibilities under the mandate of Title VI.

## CONCLUSIONS OF LAW

1. Plaintiffs have standing to bring this action on behalf of themselves and others similarly situated.

2. The Court has jurisdiction under 5 U.S.C. §§ 702–704, 28 U.S.C. §§ 1331, 1343(4), 1361, 2201, and 2202.

3. In its enactment of Title VI of the Civil Rights Act of 1964, Congress clearly indicated its intent and purpose by providing in § 2000d that:

> "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination *under any program or activity receiving Federal financial assistance.*" (Emphasis supplied)

4. HEW and all other federal agencies empowered to grant federal assistance to any program or activity are directed by § 2000d–1 of Title VI to effectuate the provisions of § 2000d by the issuance of rules, regulations and orders of general applicability consistent with the objectives of the statute authorizing financial assistance. Agencies granting federal assistance are authorized to enforce compliance with such requirements (1) by termination of or by refusal to grant or continue such assistance after opportunity for hearing and an express finding on the record of a failure to comply with such requirement, or (2) by any other means authorized by law. Prior to such enforcement action, notice of failure to comply with the requirement must be given by the agency con-

cerned and there must be a determination by the agency that compliance cannot be secured by voluntary means. After the enforcement action terminating or refusing to grant or continue assistance has been concluded, the agency is required to make a report to the appropriate committee of the House and Senate of the circumstances and grounds for such action, which shall not take effect until thirty days after the filing of such report.

■ 5. The underlying thrust of the statute requires that the agency involved, i. e., in this case HEW, attempt at the outset to secure compliance by voluntary means, if such method is reasonably possible. This course involves negotiation, and negotiation takes time. To such extent, the defendants have discretion but such discretion is not unlimited.

■ 6. Where a substantial period of time has elapsed, during which period attempts toward voluntary compliance have been either not attempted or have been unsuccessful or have been rejected, defendants' limited discretion is ended and they have the duty to effectuate the provisions of § 2000d by either administrative determination, after a hearing on the record, that there has been a failure to comply and that funds should be terminated, or by any other means authorized by law, such as reference to the Department of Justice. Under such circumstances, defendants cannot rely on their alleged complete discretion as jus-

tification for permitting the mandate of the statute to be unenforced.[1]

7. Title VI of the Civil Rights Act of 1964 is not a new statutory provision. The record is replete with instances occurring over long periods of time since 1964, where defendants' efforts seeking voluntary compliance has either not been attempted or have been unsuccessful or have met with rejection. In these cases, defendants cannot in their discretion permit further advances of federal assistance in violation of the statute, but have the duty of accomplishing the purposes of the statute through administrative enforcement proceedings or by other legal means.[2]

■ 8. After the initiation and during the pendency of an administrative enforcement proceeding HEW can only defer a school district's application for new program funds. After such initiation and during the pendency of administrative enforcement proceedings and until action by HEW terminating or refusing to grant or continue Federal assistance, defendants have no authority to withhold Federal payments to school systems or agencies under continuing and previously-approved programs. Under the statute, said termination action is not to become effective (a) until the agency head makes a report to the appropriate Committees of Congress, and (b) thirty days have elapsed after the filing of said report. Nor can HEW recapture funds distributed to a district

1. The discretion implied by the use of the term "all deliberate speed" in the *Brown* case has become exhausted and no longer exists. See Alexander v. Holmes County Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Green v. County School Board of New Kent County, 391 U.S. 430, 438–439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 234, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). These Supreme Court opinions have made it abundantly clear that "continued operation of segregated schools under a standard allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible. Under explicit holdings of [the Supreme Court] the obligation of

every school district is to terminate dual school systems *at once* and to operate now and hereafter only unitary schools." (Emphasis supplied) *Alexander, supra* 396 U.S. at 20, 90 S.Ct. at 29.

2. Where school authorities are in default of their obligation to proffer acceptable remedies to assure school desegregation, a District Court has broad power to fashion an appropriate remedy. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (Burger, C.J.). In the present case, the Court feels that ordering the Secretary of HEW to commence enforcement proceedings is not only appropriate but, indeed, required by the statute.

642

between the notice of hearing and the final determination of Title VI ineligibility.

■■ 9. Compliance by school districts and other educational agencies under final order of a federal court for the desegregation of the school or school system operated by such agency is, by virtue of § 2000d–5, to be deemed compliance with the provisions of Title VI. Until there has been a finding by the Court entering the order that its order has not been complied with, defendants are under no obligation to effectuate the provisions of Title VI through the means previously described. To the extent that their resources permit, defendants have the duty to monitor school districts under court order and to bring their findings to the attention of the court concerned. The responsibility for compliance by school districts and other educational agencies under court order rests upon the court issuing said order.

10. In summary, the discretion implicitly vested in defendants by statute exists solely for the purpose of achieving voluntary compliance with the requirements of Title VI. As the undisputed record demonstrates, defendants' efforts toward voluntary compliance have been unsuccessful in the case of many state and local educational agencies which continue to receive substantial federal funds in violation of the statute. Defendants now have no discretion to negate the purpose and intent of the statute by a policy described in another context as one of "benign neglect" but, on the contrary, have the duty, on a case-by-case basis, to employ the means set forth in § 2000d–1 to achieve compliance.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law. Appropriate declaratory and injunctive relief will issue upon plaintiffs' submission of an order consistent with our findings and conclusions. Plaintiffs are directed to confer with defendants on the wording and substance of such order and submit the same within thirty (30) days.