Patricia Ann ROBINSON et al., Plaintiffs,

v.

Frank VOLLERT et al., Defendants,

v.

Caspar WEINBERGER et al., Third-party Defendants.

Civ. A. No. 2643.

United States District Court, S. D. Texas, Galveston Division.

March 27, 1976.

Bryan F. Williams, Jr., Royston, Rayzor, Vickery & Williams, Galveston, Tex., and Edward H. Schwab, III, Galveston, Tex., for defendants, third-party plaintiffs.

Joseph D. Rich and Jeremiah Glassman, Dept. of Justice, Washington, D. C., for third-party defendants.

## MEMORANDUM OPINION

NOEL, District Judge.

### I. INTRODUCTION

Plaintiffs, black students and their parents, filed this action on August 18, 1959, to obtain declaratory and injunctive relief requiring the Galveston Inde-

pendent School District (hereafter called "GISD" or "the District") to administer its schools without regard to the race of its students. On January 23, 1961, the Court entered an agreed order permanently enjoining the District, its Superintendent and Board of Trustees, from discriminating on the basis of race. That order required the implementation of a "stairstep" freedom of choice desegregation plan that was fully consistent with the constitutional requirements then prevailing.[1]

The action lay quiescent for some fourteen years until the District sought leave in May, 1975, to implead the secretary of the Department of Health, Education and Welfare (hereafter called "HEW" or "the Department") and other Department officials.[2] After the District's Motion was granted, GISD filed a third-party complaint seeking to enjoin administrative enforcement proceedings initiated by HEW pursuant to Title VI of the Civil Rights Act of 1964 to terminate federal financial assistance that GISD received.[3] Although the Court entered its Order to Show Cause why an injunction should not be granted, GISD and HEW jointly requested that the Court enter a consent order that seemingly resolved the dispute in the District's favor. Plaintiffs did not appear, and no other parties sought to intervene. The Consent Order was signed on June 16 and entered on June 18, 1975.

On November 10, 1975, GISD again sought an order to show cause, alleging that HEW had failed to comply with the Consent Order in that it had denied GISD's application for funds under the Emergency School Aid Act of 1972 (here-

after called "ESAA"). Though signed by the presiding judge, the order to show cause was never formally filed and entered through error of the Clerk. HEW did, however, receive notice that a hearing was set. On the appointed day, HEW appeared through its representatives and consented to proceed in an effort to show cause. HEW agreed that its discretion in refusing to fund GISD's ESAA application would be subject to review.

A hearing was held on December 8–11, 1975, the testimony of officials from the Department and the District was received, and the Court took the matter under advisement. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

Prefatory to the Court's findings of fact, a brief summary of the pertinent statutory provisions is in order. Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000d–4, prohibits recipients of federal funds from discriminating on the basis of race, color, or national origin. 42 U.S.C. § 2000d. To implement that command, section 602 of the Act requires federal agencies that administer federal assistance to adopt enforcement procedures culminating in the termination of aid to recipients that fail to comply. 42 U.S.C. § 2000d–1. Four years after the Act's passage, Congress added a proviso stating that compliance by a local education agency with a final order of a federal court for the desegregation of schools is to be deemed compliance with Title VI. Elementary and Secondary Education Amendments of 1967 § 112, 42 U.S.C. § 2000d–5. The proviso's language was taken almost word for word

---

1. The 1961 desegregation Order adopted the plan approved in *Boson v. Rippy*, 285 F.2d 43 (5th Cir. 1960). *Boson*, in turn, was premised on *Kelley v. Board of Education*, 270 F.2d 209 (6th Cir. 1959), in which the Supreme Court denied certiorari, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959). *Compare Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), *with Green v. County School Bd.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

2. The District also sought to designate its present officials as parties defendant, and to

appoint new persons to represent the plaintiff class.

3. By counter-claim, the District also sought a declaratory judgment that it had eliminated the last vestiges of its former dual system and that it is now operating a "unitary" system within the meaning of *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

from a regulation adopted by HEW shortly after the Act's passage. *See* 45 C.F.R. § 80.4(c) (1964).

The Emergency School Aid Act, 20 U.S.C. §§ 1601–1619, was enacted to aid local school agencies in the process of eliminating and preventing minority isolation. 20 U.S.C. § 1601. To qualify for ESAA funds, school districts are required to establish what HEW denominates as their "threshold eligibility" by showing that they are implementing one of three types of desegregation plans: a plan undertaken pursuant to the order of a court or other appropriate body, a plan approved by HEW as adequate under Title VI, or one of several types of voluntary plans. 20 U.S.C. § 1605(a). A school district is ineligible under the Act if it has transferred property to a private segregated academy, discriminated against minority employees, assigned students to classes on a discriminatory basis, or limited school activities to avoid participation by minority students. The Act also provides that an ESAA application may be approved only if HEW's Assistant Secretary determines that the applicant's threshold eligibility plan does not involve freedom of choice, unless he determines that freedom of choice "has achieved, or will achieve, the complete elimination of a dual school system in the school district . . .." 20 U.S.C. § 1609(a)(7).

## II. THE SEQUENCE OF EVENTS

There is no contention that the District has violated the 1961 desegregation Order. Instead, the evidence indicates that the District voluntarily implemented supplemental programs designed to desegregate its schools at a more rapid rate than that literally required by the Court. The District's progress in these efforts went unchallenged until April, 1973.

Prior to that date, no request for funds administered by HEW was denied on the basis of noncompliance with the Department's Title VI criteria. In fact, HEW determined in 1968 that the District's plan "should eliminate all vestiges of the dual school system that existed prior to the 1961 Order," and commended the District for its leadership.[4]

During the two previous school years, 1972–73 and 1973–74, HEW approved the District's application under ESAA for funds to assist in the operation of a Guidance and Counseling Center. The Center, which seeks to prevent school dropouts, served 531 students during the 1973–74 school year, consisting of 290 Blacks, 119 Spanish-surnamed students, and 122 non-minority students.[5] The HEW official most familiar with the program characterized it as excellent.

Although prior to 1975 HEW had given no indication that the District was ineligible to receive funds under ESAA, the decision early in 1973 of *Adams v. Richardson,* 351 F.Supp. 636 (D.D.C.), made apparent that the Department's previous position would undergo a marked change. In that case, the District Court for the District of Columbia held that HEW had not sufficiently enforced Title VI's requirements. Among other directives not pertinent here, the *Adams* Court enjoined HEW to notify some 85 school districts that they were presumptively in violation of *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and to require them to rebut or explain the substantial disproportion thought to exist in their schools. *Adams v. Richardson,* 356 F.Supp. 92 (D.D.C.), *aff'd as modified,* 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973). HEW's Office for Civil Rights (hereafter called "OCR") advised the District accordingly in April, 1973.

---

4. Defendant's Exhibit 26. The Department's approval of the District's progress is not without significance inasmuch as HEW's Title VI criteria closely track the Constitution's requirements. *See United States v. Jefferson*

*County Bd. of Educ.,* 372 F.2d 836, 859 (5th Cir. 1966).

5. Defendant's Exhibit 32.

Unknown to HEW,[6] the District was mistakenly included in the group of 85 districts listed in *Adams*. In its Memorandum and Order filed on December 19, 1975, this Court noted:

Section 2000d–5, title 45 [42] U.S.C., provides that a school district's compliance with a final court order for desegregation of that district's schools shall be deemed compliance with the requirements of Title VI. The *Adams* Court recognized that

Until there has been a finding by the Court entering the order that its order has not been complied with, [HEW] is under no obligation to effectuate the provisions of Title VI through administrative or judicial enforcement proceedings. . . .
The responsibility for compliance by a school district and other educational agencies under court order rests upon the court issuing said order.

356 F.Supp. at 99. Since the Order entered by this Court on January 23, 1961 is a final desegregation order within the meaning of section 2000d–5, it is apparent that the *Adams* opinions were entered without knowledge of it. Thus, GISD was misclassified as a school district with respect to which HEW retained Title VI administrative compliance responsibilities.

Accordingly, this Court directed appropriate government officials to advise the *Adams* Court "of the pendency of this action and of this Court's finding that its 1961 Order is a final desegregation order within the meaning of 42 U.S.C. § 2000d–5. . . ."

Between April, 1973 and May 2, 1974, officials from HEW's Regional Office met and exchanged correspondence with GISD representatives. As a result, it became clear that the sole basis for the contention that the District was in violation of Title VI lay in the fact that four of the District's schools reflected the statistical disproportion condemned in *Swann*.[7]

During its discussions with HEW, GISD submitted various documents to show that this statistical imbalance could be explained on grounds other than the existence of vestiges of a dual system, such as an increase in the proportion of minority students to over 60%, a significant decline in the total number of school age children, and changes in the District's demographic patterns.[8] Although HEW did not present any witness who personally evaluated GISD's position, it appears that the Department took the position that as long as the four schools maintained the statistical disproportion, the District would be held ipso facto to be in noncompliance.[9] Though the District emphasized the importance of an on-site inspection, HEW apparently ignored these invitations. There is no evidence that HEW conferred with any student, teacher, parent or other person aside from GISD officials, concerning the school system. Meaningful inquiry as to the factual basis for HEW's evaluation of GISD was largely foreclosed by repeated references to the obscure lines of bureaucratic authority. HEW's responses to the District's submissions, in short, reflect a minimal knowledge of

---

**6.** While the OCR's April 1973 letter requested that each school district notify it if the district was subject to a final court order, GISD failed to do so. Although it appears that HEW may have known of the 1961 Order by January 7, 1974, see Defendant's Exhibit 24, it is clear that the Department was made aware of the Order by May 9, 1975, at the latest.

**7.** Defendant's Exhibit 11. The number of schools allegedly affected with the disproportion was reduced to three after one of them was closed in 1973. The three remaining schools included two elementary and one mid-

dle school. The District currently administers 11 elementary, 4 middle, and one senior high school, the latter being fully integrated since it serves the entire District. .

**8.** Defendant's Exhibits 5, 7, 9, and 10.

**9.** Defendant's Exhibit 11. The Court observes that the Fifth Circuit has recently made clear that the existence of a statistical disproportion does not necessarily indicate that a formerly dual system has not become unitary. *Calhoun v. Cook*, 522 F.2d 717 (5th Cir. 1975), *petition for rehearing denied*, 1975 (per curiam).

the conditions actually prevalent.[10] Accordingly, the Court finds that no credible evidence demonstrates that the Department gave meaningful consideration to the relevant facts.

On May 2, 1974, HEW's Regional Office advised the District that it was referring all questions concerning the status of the District's desegregation efforts to the Office for Civil Rights in Washington with the recommendation that "administrative enforcement proceedings be initiated immediately." [11] The District was directed to send any further communication to the Director of the Education Division of the OCR in Washington. HEW took no further action until approximately one year later, when, by letter dated April 29, 1975, the District was advised that the OCR would request HEW's Office of General Counsel to initiate enforcement proceedings unless the District demonstrated its compliance with Title VI within 60 days.[12] This letter made express that it was evoked by a Supplemental Order entered in the *Adams* litigation on March 14, 1975, directing HEW to commence Title VI enforcement proceedings against a group of school districts that again included GISD. *Adams v. Weinberger*, 391 F.Supp. 269 (D.D.C.1975). Accordingly, the Court finds that the April 29th letter was not based on any new or additional consideration given GISD's case by HEW's Washington Office for Civil Rights, but was premised upon information submitted to HEW's Regional Office a year before.[13]

Contemporaneously with these events, GISD's application [14] for $173,059 under the Emergency School Assistance Act (ESAA), the denial of which is in issue here, was winding its way through the administrative labyrinth. HEW's Regional Office received the application on May 5, 1975, about the same time that the *Adams* inspired letter of April 29 was transmitted by HEW. GISD's ESAA application was approved by the Regional Office from a fiscal and programmatic standpoint and was ranked second in merit among some 45 other ESAA proposals submitted by other school districts within the same area. In due course, the application was transmitted to Washington where purportedly it was reevaluated by Dr. Herman E. Goldberg pursuant to his authority to make final decisions concerning ESAA grants. The evidence is clear that the application met all programmatic and fiscal requirements and that but for HEW's last minute legal conclusion that GISD did not meet ESAA's civil rights requirements, the application would have been funded in the amount of $162,558.00.

On May 9, 1975, the District's counsel arranged a conference with HEW's officials in Washington and requested that the administrative proceedings be suspended inasmuch as the District's desegregation efforts were subject to the supervision of this Court pursuant to its 1961 Order. A copy of the 1961 Order was delivered during the conference, which was presided over by A. J. Howell, the OCR official having direct and initial

---

10. For example, HEW initially took issue with the pupil population of specialized educational programs including the Shriner's Burn Institute, the Education Unit of Graves Psychiatric Hospital—University of Texas Medical Branch, and the District's "Homebound" Education Program. The first of these programs was offered to children undergoing treatment for burns; the second included only children suffering from mental disorders; and the third was limited to children whose physicians declared them to be physically unable to attend school. Defendant's Exhibits 6, 7, 8, and 9. Obviously, no statistical balance rationally could be maintained under these circumstances.

11. Defendant's Exhibit 11.

12. Defendant's Exhibit 12.

13. This conclusion is also supported by the fact that the April 29th letter gave notice that in the absence of compliance administrative proceedings would be commenced within 60 days from the date of the *Adams* Court's Supplemental Order.

14. Defendant's Exhibit 3; Government's Exhibit 1.

468

responsibility for supervision of areas that included the District. On the mistaken and somewhat haughty theory that the 1961 Order was a "moribund old thing,"[15] HEW summarily rejected the District's position. On May 13, 1975, five days later, the threatened administrative action was commenced by notice[16] to the District that HEW was ordering deferred[17] "any application filed with this Department for Federal funds for new programs and activities." On the same day, HEW also sent the District a Notice of Opportunity for Hearing in connection with "Consolidated Compliance Proceeding Docket No. S–85,"[18] the style of the administrative enforcement proceeding. By this action, HEW sought findings that the District was not in compliance with Title VI's requirements and that the District's compliance could not be achieved voluntarily, together with an order terminating financial assistance administered by the Department. These proceedings were designed to terminate all Federal financial assistance administered by HEW to the District.

 On May 23, 1975, the District sought and on June 2 obtained leave to implead HEW in this action. Although GISD's third party complaint did not strictly meet the requirements of Rule 14, *Fed.R.Civ.P.*, the Court was of the view that leave to implead HEW should be granted inasmuch as GISD's claim directly implicated both the merits and the procedural status of this action. *See Kelley v. Metropolitan County Bd. of Educ.*, 372 F.Supp. 540 (M.D.Tenn.1973) (third party action to compel HEW to supply ESAA funds for purchase of bus-

es). *See also, Lee v. Macon County Bd. of Educ.*, 270 F.Supp. 859 (M.D.Ala.1967), *aff'd sub nom.*, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967). While HEW has challenged this Court's subject matter jurisdiction, it has neither suggested that it was improperly implead, nor moved to strike, sever or dismiss. *See Fed.R.Civ.P.* 14(a); 6 Wright & Miller, *Federal Practice & Procedure* § 1460 (1971). The Department's contention that this Court lacks jurisdiction of the subject matter is without merit. 28 U.S.C. § 1361; *see Kelley v. Metropolitan County Bd. of Educ., supra.*

Having filed its third-party complaint, the District shortly thereafter obtained an Order from this Court requiring HEW to show cause on June 16, 1975, why it should not be restrained from any further administrative proceedings affecting the District's right to receive Federal funds. Before that date, however, HEW's representatives initiated discussions with the District's counsel to explore the possibility of resolving between themselves the propriety of the Title VI compliance proceedings. Inasmuch as the Supplemental Order in *Adams* compelled HEW to prosecute Title VI proceedings against all school districts that had been designated as not being under a court desegregation order, it is manifest that HEW had begun to take a view of this Court's 1961 Order different from that expressed at the May 9th conference. Apparently in light of 42 U.S.C. § 2000d–5's provision that compliance with a final court desegregation order is compliance with Title VI, HEW expressed its willingness to terminate the administrative proceedings. During the discussions, counsel for HEW

15. HEW was perhaps led to this conclusion by the fact that this case was "closed" by the Clerk in 1963. That action, however, was a nullity inasmuch as it was contrary both to the explicit provision of the 1961 Order that "this action shall be retained on the docket" and to this Court's duty to retain jurisdiction. *See, e.g., Raney v. Board of Educ.*, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); *Green v. County School Bd.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

16. Defendant's Exhibit 13.

17. "Deferral" permits HEW to halt consideration of new applications for federal funds during the pendency of a Title VI administrative hearing. 42 U.S.C. § 2000d–1; see *Board of Public Instruction v. Cohen*, 413 F.2d 1201 (5th Cir. 1969).

18. Defendant's Exhibit 14.

stated that the draft order that the parties intended to submit to the Court might cover only Title VI procedures, and not grants under ESAA. That problem was removed as an impediment to the agreement, however, for on June 6, 1975, HEW Regional Program Officer Joe Smith advised Tom Porter, the District's Assistant Superintendent, that GISD's ESAA application had been approved and would be funded in the amount of $162,558.00.[19] It appears that Smith did not, in fact, possess authority to notify a school district that the Department had approved an application. For at least two previous years, however, the Regional Program Officer had performed this function. Formal written notification from Washington followed.

In reliance on Smith's representation to the District of June 6, 1975, that the ESAA application had been granted, the District's counsel agreed to the Consent Order of June 16, 1975. So far as pertinent, the Order provided:

(1) The third party defendants, their officers, agents, employees, and attorneys will not proceed with or attempt to conclude any administrative proceedings pursuant to Section 602 of the Civil Rights Act of 1964 and 45 C.F.R. Parts 80 and 81, styled, 'In the Matter of Galveston Independent School District, Texas, and Texas Education Agency, Respondents', and bearing Docket Number S–83 on the docket of the Hearing Clerk (Civil Rights), Department of Health, Education, and Welfare, and shall not proceed with or attempt to conclude such proceeding or any other administrative enforcement pursuant to 45 C.F.R., Parts 80 and 81, for the purpose of withholding

from or depriving said School District of any Federal financial assistance or funds under their control or administration for the reason that such School District is or has failed to desegregate its school system, or any school or schools comprising a part of such system in violation of regulations promulgated under Title VI of the Civil Rights Act of 1964 pending further order of the Court.

(2) The third party defendants will allow filing of, and consider, evaluate, process, and act upon, any request or application by defendant Galveston Independent School District for Federal financial assistance or funds under their control, supervision, or administration, with which it has sought or may seek to fund or defray the cost of any educational program to which it would be entitled. HEW funding shall not be deferred pursuant to 45 C.F.R. § 80.81(b) inasmuch as HEW has agreed not to proceed with administrative proceedings as outlined in paragraph 1, pending further order of the Court.

The third and fourth paragraphs made clear that the Order was not to be taken as precluding litigation in court. The order was stated to "have the same force and effect of a preliminary injunction . . . ."

On the same day that the Consent Order was signed—June 16, 1975—GISD received a mailgram prepared by the OCR and signed by Dr. Goldberg stating that the District was not eligible for the ESAA grant

because it maintains four schools with substantially disproportionate minority group enrollments and has failed to rebut or explain such disproportions.

---

**19.** The finding that Smith advised Porter on June 6, 1975, that GISD's ESAA application had been approved and would be funded is undisputed. Smith also advised Porter that one budgetary item for a "multiculture specialist" had been disapproved and that he would amend the budget accordingly. GISD then discovered that it had inadvertently omitted certain fringe benefits from the budget. The District submitted a supplemental budget em-

bracing these revisions on June 18, 1975. Government's Exhibit 3. Porter reported to the District's Board of Trustees on June 11, 1975, that the ESAA application had been funded. Defendant's Exhibit 30. Smith's advice to Porter was without reservation or limitation which would have suggested that any further approval, either as to civil rights compliance or otherwise, was necessary.

Your District was informed of this determination by letters from the Office for Civil Rights of April 29 and May 13, 1975.[20]

Although this finding was putatively premised on section 706(d)(1)(D) of ESAA, the references to OCR's letters of April 29 and May 13, together with the testimony and exhibits[21] make apparent that the denial of the grant was based solely on HEW's previous determination that GISD was in violation of Title VI.

Four days later, the District received a letter from Peter Holmes, Director of HEW's Office for Civil Rights in Washington that seemingly contradicted Dr. Goldberg's June 16 Mailgram. Holmes stated that "I am lifting the deferral imposed in my letter of May 13, 1975. The Galveston Independent School District is now eligible to apply for and receive all classes of Federal financial assistance for which it would otherwise be entitled effective as of June 16, 1975."[22]

After GISD received the June 16th mailgram, its attorney sought to bring to Dr. Goldberg's attention the existence of the June 16 Consent Order. Dr. Goldberg referred those inquiries to the Office of General Counsel and the Office for Civil Rights, on whom he wholly relied in civil rights compliance matters. On June 25, 1975, Dr. Goldberg sent a second mailgram[23] to GISD prepared by those officers stating that the Department had "overlooked" a more serious defect in GISD's application than that mentioned in his June 16 mailgram. This document begins with the observation that threshold eligibility for an ESAA grant must be met by a desegregation plan implemented pursuant to a final court order, approved by the Secretary as adequate under Title VI, or voluntarily adopted with the Secretary's approval. Dr. Goldberg then noted that GISD's application was originally made on the basis of a plan approved by HEW as adequate under Title VI, and concluded that the District was ineligible because the OCR had determined that GISD was not implementing that plan. The mailgram disposed of GISD's contention that this Court's 1961 desegregation Order constituted a plan meeting ESAA's threshold eligibility requirements with the comment that "[t]he 1961 court order involved freedom of choice as a means of desegregation and, as indicated . . . in our June 1[6] telegram, freedom of choice has not achieved and does not appear likely to achieve the complete elimination of a dual system in your school district." This finding was stated as violating ESAA's requirement that the plan "does not involve freedom of choice as a means of desegregation, unless the Assistant Secretary determines that freedom of choice has achieved, or will achieve, the complete elimination of a dual school system . . . ." Section 710(a)(7), Emergency School Assistance Act, 20 U.S.C. § 1609(a)(7). The mailgram deemed the June 16 Consent Order "quite irrelevant" to the District's eligibility because it was seen as concerning only Title VI proceedings, while the prerequisites for an ESAA grant were stated as being separate and apart from Title VI.

Although the oral testimony bearing upon the OCR's determinations was

---

**20.** Defendant's Exhibit 15; Government's Exhibit 8.

**21.** James McClure of HEW's Regional Office for Civil Rights testified that his office viewed HEW's determination that the District was not in compliance with Title VI as foreclosing further consideration of the District's civil rights eligibility under ESAA. The documents prepared by the Regional OCR reveal that on June 19, 1975, only three days after the Consent Order was signed, John Bell, Chief of the Regional OCR, determined that GISD's application should not be funded because "The Galveston Independent School District has failed to develop a desegregation plan to further desegregate its schools pursuant to the requirements of Title VI of the Civil Rights Act of 1964." Government's Exhibit 6.

**22.** Defendant's Exhibit 16.

**23.** Defendant's Exhibit 17.

vague, the Court finds that that Office's conclusions were not based on any new and independent fact finding on the part of HEW, but were based solely on the conclusions HEW had reached during its inquiry into GISD's Title VI compliance. In the Court's view, the various documents emanating from HEW's Washington headquarters were largely ex post facto rationalizations for a course of action that, so far as the record reveals, was chosen precipitously and without any careful analysis of the facts. The District Court for the Middle District of Tennessee, confronted with a similar case in which Dr. Goldberg's name appears, concluded that " . . . the candor and clarity of the testimony of [HEW's] witnesses were in inverse proportion to their rank in the chain of command." *Kelley v. Metropolitan County Board of Education*, 372 F.Supp. 540 (M.D.Tenn.1973). This Court concurs with that view.

On June 30, Dr. Goldberg, various other HEW officials and GISD representatives met in Washington, but were unable to resolve their disagreement. In a third letter dated August 11, 1975,[24] Dr. Goldberg informed GISD that, based on the information presented at the June 30 meeting, he had concluded that the District was still ineligible for the reasons stated in his June 16 and 25 mailgrams.

## III. VIOLATION OF THE CONSENT ORDER

■ On the foregoing facts, GISD alleges that the Department violated the June 16th Consent Order. GISD maintains that the Consent Order prevented HEW from declining to grant any funds, including those provided under ESAA, on the basis of an administrative determination that the District had not sufficiently desegregated its schools. HEW argues that the Order precluded only proceedings pursuant to Title VI and left

the Department with discretion to determine that GISD failed to meet ESAA's civil rights eligibility requirements. In the Department's view, the Galveston School District's interpretation would give the Order an impermissibly broad effect inasmuch as an agreed order's scope must be discerned from within its "four corners."[25] *See United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *Star Bedding Co. v. Englander Co.*, 239 F.2d 537 (8th Cir. 1957). Thus, a court may not construe a consent decree to prohibit acts not expressly condemned to implement some hypothetical "purpose." *See id.* The June 16th Order, however, is distinguishable from those in the cited cases because its purpose was stated expressly in the first numbered paragraph as being to preclude HEW from "withholding or depriving said School District of any Federal financial assistance or funds under their control or administration for the reason that such School District is or has failed to desegregate its school system . . . . " Given that the Order's purpose is made express, it seems not amiss to take it into consideration. Of equal importance, the Order's second numbered paragraph broadly provided that

> The third-party defendants [HEW] will allow filing of, and consider, evaluate, process, and act upon, *any request* or application by defendant Galveston Independent School District for Federal financial assistance or funds under their control, supervision, or administration, which it has sought or may seek to fund or defray in the cost of *any education program* to which it would be otherwise entitled.

(emphasis added).

The emphasized language makes entirely clear that the Order required HEW to consider, process and act upon all GISD applications. Thus, although

---

24. Defendant's Exhibit 18.

25. Many court's have read consent decrees narrowly because the consequences of disobedience are typically contempt proceedings.

*See, e. g., Star Bedding Co. v. Englander Co.*, 239 F.2d 537 (8th Cir. 1957). Since GISD seeks only an award of the funds that it was denied, that factor is not a consideration here.

the Order refers in terms only to Title VI and its implementing regulations, it cannot be said that the Order excludes ESAA from its provisions. Even HEW seems to concede this much. Similarly, there can be no doubt that neither this nor any other language contained in the Order required the Department to grant any request for funds made by GISD.

Stated concisely, the issue is whether the Order prevented HEW from refusing "any" application, including those submitted under ESAA, solely on the ground that the District was ineligible to receive assistance because of the status of its desegregation efforts. The Court concludes that this question must be answered in the affirmative for the following reasons. First, the language quoted above from the first numbered paragraph states that HEW was not to deny funds on the basis of GISD's desegregation progress while the language from the second numbered paragraph makes clear that that prohibition included all education funds under HEW's control. Second, as will appear below, the ESAA statute's eligibility provisions are inseparable from and equivalent to Title VI's requirements. Thus, in the absence of a clause expressly excluding ESAA funds,[26] HEW could not consistent with the Order make the same determination pursuant to ESAA that it had promised not to make pursuant to Title VI. Third, HEW was bound by its own interpretation of the Consent Order's requirements as stated by the OCR's Director, Peter Holmes, in his letter of June 20th. That document states that GISD was "*eligible* to apply for and receive *all* classes of Federal financial assistance." (emphasis added).

HEW also argues that ESAA is entirely distinct from Title VI and that unlike Title VI, ESAA requires it to make an administrative determination that an applicant for funds meets the Act's civil rights eligibility criteria even though the applicant is subject to a final court de-

segregation order. Under this reading of the statute, HEW must administratively determine the sufficiency of a court desegregation order if a school district submits the order to meet the Act's threshold eligibility requirement. Dr. Goldberg went so far as to take the view that ESAA authorized HEW to make such a determination even if a federal court entered a declaratory judgment holding that a school district had completely fulfilled its constitutional obligations to dismantle a formerly dual system. HEW concludes that the Consent Order's scope is limited by ESAA's requirements, for the Consent Order could not remove HEW's statutory obligation to determine the sufficiency of GISD's desegregation plan.

■ The Court is of the view that the premise of HEW's argument is invalid. The Act does *not* grant HEW the authority to review the sufficiency of a Federal Court's order. Initially, it is clear from a careful reading of the Emergency School Aid Act that the pertinent provision is ambiguous. Section 706 of the Act, 20 U.S.C. § 1605, sets forth the threshold requirement that an applicant, termed "a local education agency," be implementing one of three types of desegregation plans. Subsection (a)(1)(A) governs both plans adopted pursuant to an order and plans approved as adequate by the Secretary under Title VI, while subsection (a)(1)(B) governs voluntary plans. In its entirety, section 706(a)(1)(A) provides:

> (a)(1) The Assistant Secretary is authorized to make a grant to, or a contract with, a local educational agency—
>
> (A) which is implementing a plan—
> (i) which has been undertaken pursuant to a final order issued by a court of the United States, or a court of any State, or any other State agency or official of competent jurisdiction, and which requires

---

**26.** Though not a proper consideration under the rule that a consent decree's scope is determined from its "four corners," it seems not wholly irrelevant that HEW's attorney's initiated the negotiations that eventually produced the Order and were its primary drafters.

the desegregation of minority group segregated children or faculty in the elementary and secondary schools of such agency, or otherwise requires the elimination or reduction of minority group isolation in such schools; or

(ii) which has been approved by the Secretary as adequate under Title VI of the Civil Rights Act of 1964 for the desegregation of minority group segregated children or faculty in such schools . . . .

■ HEW does not contend that GISD is not subject to a court desegregation order within the meaning of subsection 706(a)(1)(A)(i), and to avoid any doubt on that point, this Court holds that its 1961 Order is a "final order issued by a court of the United States" within that subsection's meaning. Rather, the Department contends that section 710(a)(7), 20 U.S.C. § 1609(a)(7), gives it authority to review the sufficiency of any plan under section 706. In its entirety, section 710(a)(7) provides:

(a) . . . The Assistant Secretary may approve such an application only if he determines that such application—

(7) provides that the plan with respect to which such agency is seeking assistance (as specified in section [706(a)(1)(A) of this Title]) does not involve freedom of choice as a means of desegregation, unless the Assistant Secretary determines that freedom of choice has achieved, or will achieve, the complete elimination of a dual school system in the school district of such agency . . . .

Section 710(a)(7)'s reference back to section 706(a)(1)(A) seemingly requires HEW to reevaluate all plans under that subsection to determine either that they do not involve freedom of choice, or that

if they do, the plan "has achieved or will achieve" the complete elimination of the former dual system. However, with respect to section 706(a)(1)(A)(ii) plans—those "approved by the Secretary as adequate under title VI"—it is apparent that the Secretary would have already made the very same determination in approving the plan under Title VI. That Title VI sweeps at least as broadly as section 710(a)(7)'s requirement was made clear by the *Adams* decisions which effectively read into Title VI the desegregation requirements announced in *Alexander* and *Swann*. See *Adams v. Richardson*, 351 F.Supp. 636, 639–40 (opinion), 356 F.Supp. 92, 96 (D.D.C.1973) (order), *aff'd as modified*, 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973), *order supplemented sub nom.*, *Adams v. Weinberger*, 391 F.Supp. 269, 271 (D.D.C.1975). That HEW itself takes the view that section 710(a)(7) does not require it to again review the sufficiency of a plan that it has approved under Title VI is suggested by the fact that it has not adopted any specific regulatory provision implementing section 710(a)(7). See C.F.R. Part 185 (1975). Thus, in this case, HEW used its findings made pursuant to Title VI to deny assistance under ESAA. Unless one takes the position that Congress demanded that HEW perform a needless and redundant act, it is clear that section 710(a)(7)'s reference back was not intended to include the whole of section 706(a)(1)(A).

Having established that principle, the validity of HEW's position turns on whether section 710(a)(7) includes within its reference "a final order issued by a court of the United States" in 706(a)(1)(A)(i). It is difficult to discern any Congressional purpose in subjecting court ordered desegregation plans to section 710(a)(7)'s standard, for by the time that ESAA was enacted in 1972 and during the whole of its legislative history [27] the Supreme Court had already made

---

27. The bills from which the Emergency School Aid Act eventually evolved were introduced in Congress in May, 1970. *See* H.R. 17846, introduced May 27, 1970; S. 3883, introduced May 26, 1970.

clear that freedom of choice plans that failed to achieve the complete elimination of a dual school system were constitutionally insufficient.[28] *See Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). If anything, section 710(a)(7)'s language "will achieve" suggests a standard more lax than that required by the Constitution, for in 1969 the Supreme Court required the "immediate" abandonment of dual systems. *See Alexander v. Holmes County Board of Education*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

■ The Department has sought to bolster its interpretation of the Act with legislative history indicating that Congress did not wish to fund school districts operating under inadequate freedom of choice plans. *See Hearings on S. 3883 Before Subcommittee on Education of the Committee on Labor and Public Welfare*, 91st Cong., 2nd Sess., at 97 (1970); *Hearings on H.R. 17846 Before the Subcommittee on Education of the House Committee on Education and Labor*, 91st Cong., 2d Sess., at 65, 570 (1970). This Court has no difficulty in agreeing with that proposition, for the federal government may not extend funds to an agency that practices racial discrimination. *See, e. g., Gilmore v. City of Montgomery*, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974); *United States v. City of Chicago*, 395 F.Supp. 329, 343 (N.D.Ill.1975). The issue presented by this case, however, is not whether such a district may be funded, but whether Congress contemplated that the Department would determine the adequacy of a district's desegregation efforts when it is under a Federal court order.

■ Given ESAA's ambiguous and contradictory legislative history and the close relationship between it and Title VI, it seems appropriate to inquire into the Congressional intent by looking to Title VI. As originally enacted, Title VI did not contain the proviso that compliance with a final court order would be deemed compliance with Title VI. It does appear, however, that Title VI was enacted with knowledge that HEW would accept court orders as being in compliance with the Title.[29] After the bill was passed, HEW drafted regulations stating that Title VI's requirements "shall be deemed to be satisfied if [a] school system is subject to a final order of a court of the United States for the desegregation of such school . ., and provides an assurance that it will comply with such order. . . ." 45 C.F.R. § 80.4(C)(1) (1967). That regulation was subsequently enacted into law in substantially the same terms as a part of the Elementary and Secondary Education Act Amendments of 1967. Pub.L. No.90–247, § 112, 81 Stat. 787, Jan. 2, 1968. The legislative history of the proviso, known as the "Whitener Amendment," is quite vague, and the committee reports merely summarize its provisions. *See* H.R.Rep.No.188, 90th Cong., 1st Sess. (1967); S.Rep.No.726, 90th Cong., 1st Sess. (1967); Conf.Rep.No. 1049, 90th Cong., 1st Sess. (1967). It does appear, however, that there was agitation for the regulation's repeal, *see* Comment, "The Courts, HEW, and Southern School Desegregation", 77 Yale L.J. 321, 324 n.15 (1967), and it follows that Congress wished to make absolutely plain that HEW was not to proceed administratively in cases where there was a court order.[30] To summarize, the situ-

---

**28.** Even HEW's administrative guidelines under Title VI have been described as "a restatement of the judicial standards applicable to disestablishing de jure segregation . . . ." *United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836 (5th Cir. 1966).

**29.** In response to questions concerning that issue, Senator Humphrey, the bill's floor manager, stated:

I have . . . consulted many officials of our government. It is my view that Title VI

would not be used for action terminating, reducing, or refusing assistance . . . because of dissatisfaction with the terms of the applicable court order or the speed with which it directs desegregation procedure. 110 Cong.Rec. 14,436 (1964).

**30.** It is clear from both the Senate and House debates concerning the 1967 Education Amendments that there was concern that HEW was whimsically enforcing Title VI. *See, e. g.,* 113 Cong.Rec. 37171–72 (Dec. 5,

ation is one in which ESAA and Title VI are intimately related, there is no clear indication in ESAA's legislative history that Congress intended that HEW review the sufficiency of Federal court desegregation orders, the pertinent provision of ESAA is ambiguous, and a proviso to Title VI provides that HEW may not review the sufficiency of court orders. Under these circumstances, the Court concludes that ESAA should not be read to authorize HEW to do precisely that which Congress previously forbade it from doing.[31] While HEW suggests that its interpretation of ESAA is entitled to "great weight," that canon of construction does not apply to an administrator's construction of a statute delegating his own powers. *Stark v. Brannan*, 82 F.Supp. 614 (D.D.C.1949), *aff'd*, 388 F.2d 871 (App.D.C.), *aff'd*, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497. Finally, it is important to note that this Court's construction of section 710(a)(7) does not leave it without meaning, for section 706(a)(1)(A)(i) refers to plans undertaken pursuant to the order of any state court, agency, or official. That HEW should be given the authority to review the sufficiency of *state* ordered desegregation plans is both consistent with Title VI and appropriate.

HEW's contention that it may deny federal assistance solely on the ground that it found a court order wanting in some respect not only ignores Title VI's proviso, but also amounts to an administrative repudiation of the separation of powers doctrine. No administrative agency may usurp the adjudicatory function of the courts. *See United States v. Morton Salt Co.*, 338 U.S. 632, 643, 70 S.Ct. 357, 94 L.Ed. 401 (1950); *Downen v. Warner*, 481 F.2d 642 (9th Cir. 1973); *Hargrave v. McKinney*, 413 F.2d 320, 326 (5th Cir. 1969); *Southern Christian Leadership Conference, Inc. v.*

*Connolly*, 331 F.Supp. 940 (E.D.Mich. 1971); *SEC v. Wall Street Transcript Co.*, 294 F.Supp. 298 (S.D.N.Y.1968), *reversed on other grounds*, 422 F.2d 1371 (2d Cir.), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970). The courts have, for example, made clear that the Attorney General's authority to review state voting practices pursuant to Section 5 of the Voting Rights Act of 1965, *as amended*, 42 U.S.C. § 1973c (Supp.1976), does not extend to court ordered plans. *East Carroll Parish School Board v. Marshall*, —— U.S. ——, 96 S.Ct. 1083, 47 L.Ed.2d 296, 44 U.S.L.W. 4320 (1976); *Conner v. Johnson*, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971); *Kirksey v. Board of Supervisors*, 528 F.2d 536 (5th Cir. 1976). In *Zimmer v. McKeithan*, 467 F.2d 1381 (5th Cir. 1972), *rev'd on other grounds on rehearing en banc*, 485 F.2d 1297 (1973), the Fifth Circuit explained that

. . . *court ordered plans* resulting from equitable jurisdiction over adversary proceedings are not controlled by Section 5. If this were not so, the exercise of jurisdiction by the courts would be meaningless. The Attorney General has no authority to review or set aside the judgments of courts duly entered in the exercise of their jurisdiction over the parties and subject matter.

(emphasis on original). Thus, the courts bear the ultimate responsibility to determine when the operation of a school system violates rights guaranteed by the Constitution. *Kemp v. Beasley*, 352 F.2d 14, 19 (8th Cir. 1965); *Clark v. Board of Education*, 374 F.2d 569 (8th Cir. 1967); *see Bowman v. County School Bd.*, 382 F.2d 326, 328 (4th Cir. 1967); *Singleton v. Jackson Municipal Separate School Dist.*, 355 F.2d 865 (5th Cir. 1966); *Whittenberg v. Greenville County School Dist.*, 298 F.Supp. 784, 789 (D.S.C.1969);

---

1967) (remarks of Congressman Fountain); 113 Cong.Rec. 35703–04 (Dec. 11, 1967) (remarks of Senator Russell).

31. ". . . where the interpretation of a particular statute at issue is in doubt, the express language and legislative construction of another statute not strictly *in pari materia* but employing similar language and applying to similar persons, things, or cognate relationships may control by force of analogy." *Stribling v. United States*, 419 F.2d 1350, 1352–53 (8th Cir. 1969).

*United States v. Elloree School District No. 7*, 283 F.Supp. 557, 562 (D.S.C.1968).

Precedent in this Circuit leaves no doubt that the Department's action in this case violated the separation of powers principle. In *Lee v. Macon County Board of Education*, 270 F.Supp. 859 (M.D.Ala.1967), HEW terminated assistance to a school district after finding that the district was not in compliance with a court decree. HEW alleged that the termination was permitted by Title VI, but a three-judge court held that that action violated

> ". . . The generally recognized rule that the courts are the branch of government ultimately responsible for the vindication of constitutional rights in the school area. This means nothing more or less than that judicial approval of a plan of desegregation—and particularly where there is good faith implementation of the plan by the school authorities—establishes eligibility for federal aid. In such instances, the Executive officials, acting through the Department of Health, Education and Welfare or any other branch of the government, may not, by terminating funds, in effect disapprove a court-adopted plan."

The Court then observed that HEW's action in terminating federal financial assistance to a school district that was operating under a court order amounted to an attack on the order and served to thwart its implementation. The court concluded as a "general proposition" that

> ". . . there can be no termination of federal financial assistance by the Department of Health, Education and Welfare as to any of the school systems under the order of this Court, where said systems have given assurance of compliance to the Department of Health, Education and Welfare and are in full compliance with the requirements of the said court order, without prior Court approval. To permit the Department of Health, Education and Welfare to terminate funds to school systems under the order of this Court would be an abdication on

the part of the Court of its authority to require compliance with a court order. There can be no administrative supervision or review of a judicial decree. There must be judicial approval of the termination of federal financial assistance when a school system is operating under a court order.

270 F.Supp. at 866.

In a per curiam opinion, the Supreme Court affirmed. *Wallace v. United States*, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1968) (sub nom.).

In *United States v. Jefferson County Board of Education*, 5 Cir., 372 F.2d 836 (1966), aff'd en banc, 5 Cir., 380 F.2d 385, cert. denied, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967), the Fifth Circuit wrote at length upon the interrelated responsibilities of the federal courts and the administrative branch in assuring complete desegregation. *Jefferson* held that HEW's desegregation guidelines embodied the minimum constitutional standards, and taught that the courts should cooperate in making administrative agencies effective instruments for enforcing desegregation in public schools. Yet the Court also observed that "to the courts belongs the last word in any case or controversy," and held that *as implemented* by HEW, Title VI "does not conflict with the proper exercise of the judicial function or with the doctrine of separation of powers." 372 F.2d at 852–53, 856. Thus, "[s]chools automatically qualify for federal aid whenever a final court order desegregating the school has been entered in the litigation and the school authorities agree to comply with the order." 372 F.2d at 848.

 HEW has also maintained, both in its June 16th mailgram and in its brief, that GISD was ineligible under ESAA by virtue of section 706(d)(1)(D), 20 U.S.C. § 1605(d)(1)(D). That section provides that a school district is not eligible for ESAA funds if it has

> . . . had in effect any other practice, policy, or procedure, such as limiting curricular or extra-curricular activities (or participation therein by children) in order to avoid the participa-

tion of minority group children in such activities, which discriminates among children on the basis of race, color, or national origin . . . .

Dr. Goldberg stated that it is not HEW's position that GISD excluded minority children from any school activity, but that the mere existence of a significant statistical disproportion of itself rendered GISD ineligible. The Court is of the view that that interpretation reads section 706(d)(1)(D) too broadly. Section 706(d)'s language makes clear that it was aimed at specific forms of discrimination that may occur even in perfectly proportioned systems. More importantly, for the reasons stated with reference to section 710(a)(7), section 706(d) should not be construed to effectively authorize HEW to review the sufficiency of a court order.

■■■ Finally, HEW suggests that ESAA and Title VI are to be distinguished because the former is a grant-in-aid program, while the latter is an enforcement device intended to assure that recipients of federal largess do not discriminate. From this distinction, the Department deduces that it may legitimately apply eligibility criteria established by Congress for ESAA grants, even though it may not under Title VI usurp the courts' power to enforce the Constitution's requirements. In the Court's view, this argument is premised on mere semantics, for Title VI may be viewed as an "eligibility criterion" for all federal financial assistance. Whatever the descriptive term, a refusal to fund an ESAA application solely on the ground that a court order does not go far enough would embody an administrative determination that the order was constitutionally insufficient. Such administrative conduct cannot be viewed as other than an invasion of the authority of the district court promulgating the order and of the appellate courts' authority to review it. The Lee decision made clear that a district under court

order might well be subject to inconsistent standards if HEW were permitted to make an independent determination that it had failed to sufficiently desegregate its schools. 270 F.Supp. at 865–66. Moreover, in many cases the availability of federal funds will be a prerequisite to the implementation of a court-ordered desegregation plan. E. g., Kelley v. Metropolitan County Board of Education, 372 F.Supp. 540 (M.D.Tenn. 1973). In the Adams litigation, the Department itself took the position that for it merely to monitor school districts under court order would impermissibly usurp the court's authority. 351 F.Supp. at 639.

That HEW may not review judicial decrees does not leave the Department without a function in those instances. Pursuant to 45 C.F.R. § 80.8, HEW may refer its findings to the Department of Justice, which may in turn bring suit upon a complaint under Title IV of the 1964 Civil Rights Act, 42 U.S.C. § 2000c–6. Alternatively, the Attorney General could and may intervene independently in this action pursuant to Title IX, 42 U.S.C. § 2000h–2, if he certifies that the case is of public importance. The June 16 Consent Order expressly permitted HEW to assert its claims in this action pursuant to the Rules of Procedure. Finally, the four Adams opinions required HEW to monitor, to the extent of its resources, school districts under court order and to bring its findings to the attention of the court concerned.[32] Adams v. Richardson, 351 F.Supp. 636, 642 (D.D. C.1972) (opinion); 356 F.Supp. 93, 99 (1973) (order); Adams v. Richardson, 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973) (affirming order as modified, en banc); Adams v. Weinberger, 291 F.Supp. 269, 272–73 (1975) (supplemental order).

## IV. CONCLUSION

■■■ To characterize the facts as revealing administrative misfeasance, mal-

---

**32.** In this regard, the Court finds it inexplicable that although HEW first determined that GISD was not in compliance with Title VI in

1973, HEW has made no effort to date to bring its findings to this Court's attention.

478

feasance, and nonfeasance would fall short of exaggeration. The Court concludes that the Department denied GISD's ESAA application solely on grounds that were not within its discretion under any statute, and that were expressly prohibited by the terms of the Consent Order entered on June 16, 1975. Thus, this case is not one in which HEW has denied funds on an illegal ground and which must be remanded because legitimate administrative determinations remain to be made. *See, e. g., Kelley v. Metropolitan County Board of Education*, 372 F.Supp. 528 (M.D.Tenn. 1973). Here, the Department has exercised its discretion in every respect required by statute, and would have funded the District's application had it not unlawfully determined that the District was ineligible by virtue of its desegregation status. Accordingly, this Court declares that HEW is in violation of the June 16th Consent Order and that GISD is entitled to have its 1975–76 ESAA application funded in the amount of $162,558.00.[33] Inasmuch as the Court may not command the disbursement of funds from the Treasury in the absence of a Congressional appropriation, HEW will be required either to fund the District's application forthwith out of any available funds, or to demonstrate that funds are not available to do so.

---

**33.** The District has also argued that HEW abused its discretion in that it failed to meaningfully consider GISD's desegregation status, or to exercise any discretion at all. Either conclusion would require an order remanding the matter to the Department and would not establish that GISD is entitled to ESAA funds. *See generally Donnelly Garment Co. v. N. L.*

*R. B.*, 123 F.2d 215, 224 (8th Cir. 1942); *Scott Paper Co. v. United States*, 372 F.Supp. 721, 729 (E.D.Pa.1974). Although the findings of fact above are sufficient to establish GISD's contention in this regard, the Court need not reach that issue in view of the conclusion that HEW had no discretion to deny GISD's ESAA application.