BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF NEW YORK ET AL. *v.* HARRIS,
SECRETARY OF HEALTH, EDUCATION,
AND WELFARE, ET AL.

No. 78–873. Argued October 9, 10, 1979—Decided November 28, 1979

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. STEWART, J., filed a dissenting opinion, in which POWELL and REHNQUIST, JJ., joined, *post*, p. 152.

*Joseph F. Bruno* argued the cause for petitioners. With him on the briefs were *Allen G. Schwartz* and *L. Kevin Sheridan.*

*Solicitor General McCree* argued the cause for respondents. With him on the brief were *Assistant Attorney General Days, Deputy Solicitor General Claiborne, Jessica Dunsay Silver, Marie E. Klimesz,* and *Vincent F. O'Rourke, Jr.*

*Charles A. Bane, Thomas D. Barr, Norman Redlich, Robert A. Murphy,* and *Norman J. Chachkin* filed a brief for the Lawyers Committee for Civil Rights Under Law as *amicus curiae* urging affirmance.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents a narrow, but important, issue of statutory interpretation. It concerns a school district's eligibility for federal financial assistance under the 1972 Emergency School Aid Act (ESAA or Act), 86 Stat. 354, as amended, 20 U. S. C. §§ 1601–1619.[1] Because the federal funds available under the Act are limited, educational agencies compete for those funds.

## I

By § 702 (a) of the Act, 86 Stat. 354, 20 U. S. C. § 1601 (a), Congress found "that the process of eliminating or preventing minority group isolation and improving the quality of education for all children often involves the expenditure of additional funds to which local educational agencies do not have access." Accordingly, in § 702 (b), Congress stated that the purpose of the legislation was to provide financial assistance "to meet the special needs incident to the elimination of minority group segregation and discrimination among students and faculty in elementary and secondary schools," to encourage "the voluntary elimination, reduction, or prevention of minority group isolation" in such schools, and to aid schoolchildren "in overcoming the educational disadvantages of minority group isolation." Section 703 pronounced as United States policy that guidelines and criteria established pursuant to the Act should "be applied uniformly in all regions of the United States." And, by § 706 (d)(1), an educational agency was expressly declared ineligible for assistance if, after the date of the Act (June 23, 1972), it

"(B) had in effect any practice, policy, or procedure

---

[1] The Act was technically repealed and simultaneously re-enacted, with amendments not material here, by Title VI of the Education Amendments of 1978, Pub. L. 95–561, 92 Stat. 2252, 2268, effective Sept. 30, 1979. The re-enactment is recodified as 20 U. S. C. §§ 3191–3207 (1976 ed., Supp. II). Because they govern this case and have been used throughout the litigation, the statutory references herein are to the 1972 Act, as amended, and to the old Code sections.

which results in the disproportionate demotion or dismissal of instructional or other personnel from minority groups in conjunction with desegregation or the implementation of any plan or the conduct of any activity described in this section, or otherwise engaged in discrimination based upon race, color, or national origin in the hiring, promotion, or assignment of employees of the agency." [2]

The Act, in § 710 (a), provides that an agency desiring to receive assistance for a fiscal year shall submit an application "at such time, in such form, and containing such information" as the Assistant Secretary for Education of the Department of Health, Education, and Welfare (HEW) "shall require by regulation." The application is then reviewed by that office and is ranked according to criteria set out in § 710 (c), as implemented by regulation. See 45 CFR § 185.14 (1978). The essential first step is a determination [3] that the applicant

---

[2] A school district found to be ineligible may apply for a waiver of its ineligibility. §§ 706 (d)(1), (2), and (3). The statute's waiver provision authorizes the Secretary of the Department of Health, Education, and Welfare to permit funding of an otherwise ineligible applicant if the applicant specifies the reason for its ineligibility and submits "such information and assurances as the Secretary shall require by regulation in order to insure that any practice, policy, or procedure, or other activity resulting in the ineligibility has ceased to exist or occur and include[s] such provisions as are necessary to insure that such activities do not reoccur after the submission of the application."

The waiver provision is not involved in this case. In a subsequent proceeding provoked by the Secretary's denial of a waiver to petitioner Board for the fiscal year 1978–1979, the Court of Appeals for the Second Circuit upheld the decision of the District Court to remand the case to HEW for reconsideration. *Board of Education of the City of New York* v. *Harris*, 622 F. 2d 599 (1979). See Brief for Petitioners 21, n. *; Brief for Respondents 2, n. 2.

[3] "No application for assistance . . . shall be approved prior to a determination by the Secretary that the applicant is not ineligible by reason of this subsection." § 706 (d)(4).

is not ineligible under § 706 (d)(1). This determination is made initially by HEW's Office for Civil Rights. The burden, presumably, is on the applicant to establish its eligibility.

## II

Petitioner Board of Education of the City School District of the City of New York filed three applications for ESAA assistance for the fiscal year 1977–1978. Its revised Basic Grant Application, the only one now at issue, was given a sufficiently favorable ranking so as initially to be considered for funding in the amount of $3,559,132. On July 1, 1977, however, HEW by letter informed the Board that it did not meet the Act's eligibility requirements. App. 27. In line with the provisions of 45 CFR § 185.46 (b) (1978), an informal meeting was held on July 22. Although HEW then withdrew some of its adverse findings, it still concluded that the Board had not demonstrated a sufficient basis for revocation of its determination of ineligibility. HEW reasoned that, in the language of 45 CFR § 185.43 (b)(2) (1978), the Board's "assignment of full-time classroom teachers to [its] schools [was] in such a manner as to identify [one or more] of such schools as intended for students of a particular race, color, or national origin."

The ineligibility determination rested upon statistics developed by HEW's Office for Civil Rights during a 1976 compliance investigation of the Board's school system under Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d *et seq.* From these statistics, HEW concluded that it was possible to identify a number of schools as intended for either minority or nonminority students, solely because of the composition of the faculties. The statistics revealed that, during the 1975–1976 school year, 62.6% of high school pupils were members of a minority, but only 8.3% of high school teachers were minority members. Further, 70% of the minority high school teachers were assigned to schools at which

the minority student enrollments exceeded 76%. Conversely, in those high schools where minority student enrollments were less than 40%, there was a disproportionately low percentage of minority teachers. App. 29, 42–43.

The statistical study showed like patterns at the junior high and elementary levels. The percentage of minority junior high teachers was 16.7, and these teachers were concentrated in districts with the highest percentages of minority students. *Id.*, at 29. For the elementary schools, the citywide percentage of minority teachers was 14.3, and these were placed primarily in districts with the largest minority student enrollments. *Id.*, at 28–29. HEW also relied upon findings it had made earlier that the Board was in violation of Title VI of the 1964 Act.

At the informal meeting of July 22, HEW limited its inquiry to the accuracy of the statistics upon which it had rested its decision to deny funding. No substantive rebuttal or explanation for the statistical disparities was presented. On September 16, 1977, HEW issued its formal opinion adhering to its decision of July 1 to deny funding. Brief for Petitioners 8.

The present action then was promptly instituted in the United States District Court for the Eastern District of New York to obtain declaratory relief, to enjoin HEW from enforcing its determination of ineligibility, and to award the initially earmarked funds to the Board.[4] The complaint contained no challenge to the accuracy or sufficiency of HEW's statistics. Rather, petitioner Board took the position that the racially disproportionate teacher assignments resulted from provisions of state law, from provisions of collective-bargaining agreements, from licensing requirements for

---

[4] Although the litigation was instituted by petitioner Board (and its Chancellor) and by a number of Community School Districts, only the Board's request for funds remains contested. See Brief for Petitioners 8, n. **; Brief for Respondents 3, n. 3; Reply Brief for Petitioners 3, n. *.

particular teaching positions, from a consent decree relating to bilingual instruction (*Aspira of New York, Inc.* v. *Board of Education*, 72 Civ. 4002 (SDNY Aug. 29, 1974); see *Aspira of New York, Inc.* v. *Board of Education*, 65 F. R. D. 541 (SDNY 1975)), and from demographic changes in student population. The Board expressly denied that it had engaged in intentional or purposeful discrimination. App. 134–149.

Initially, the District Court, after its review of the administrative record and after a hearing, denied the Board's motion for summary judgment and granted HEW's cross-motion, thus affirming the denial of funding. The court said:

> "[T]here was a reasonable basis for a decision that it had so discriminated. This Court's powers are extremely limited. In this respect, considering the high school statistics, the State statutes, the United Federation of Teachers agreements, the wishes of individual Black principals, the desires of the individual Parent-Teachers Associations, community school board and Black and White communities, the Administrator could find a practice, policy or procedure after June 23, 1972, resulting in the identification of schools as intended for students of a particular race, color or national origin through the assignment of teachers to those schools.
>
> "Accordingly, with the greatest reluctance because it is the children of the schools who will suffer from this decision of the Administrator, the Court grants the Government's motion for summary judgment." *Id.,* at 69–70.

The Board's request for reargument, however, was granted. The District Court then concluded that HEW should have considered the justifications proffered for the statistical disparities. The matter was therefore remanded to HEW for further consideration consistent with an opinion the court issued. In that opinion, the court stated:

> "The relevant statute, regulations and cases indicate a failure of H. E. W. Before declaring a school board

ineligible for ESAA funds, H. E. W. must find either that (1) the school board was maintaining an illegally segregated school system on June 23, 1972 and it took no effective steps to desegregate after that date or (2) it had a practice after June 23, 1972 that was segregative in intent, design or foreseeable effect. It may rely on statistics alone to make this finding, but it may not ignore evidence tending to rebut the inferences drawn from the statistics.

.      .      .      .      .

[T]he Constitution mandates that the plaintiffs must have an opportunity to rebut a statistical prima facie case of discrimination." App. to Pet. for Cert. 102–104.

After the administrative hearing on remand, HEW notified the Board that its explanation for the racially identifiable staffing patterns did not adequately rebut the prima facie evidence of discrimination established by the statistics. This determination centered on disparities in 10 of the 110 secondary schools operated by the Board and serving predominantly nonminority student bodies. App. 109–110. HEW's letter of March 22, 1978, to the Chancellor discussed the several justifications offered and concluded that each was insufficient. *Id.*, at 102–114.

The Board once again sought relief in the District Court. On April 18, that court upheld HEW's finding of ineligibility as supported by substantial evidence, and denied relief. *Id.*, at 150–153. The Board appealed and obtained a stay preserving the funds at issue pending appellate review.

The Court of Appeals affirmed. *Board of Education of City School Dist.* v. *Califano,* 584 F. 2d 576 (CA2 1978). On the appeal, the Board still did not contest the finding that certain of its schools were racially identifiable "as a result of the significant disparities in staff assignments." *Id.*, at 585. The Board, instead, argued that HEW was required " to establish that the disparities resulted from purposeful or intentional

discrimination in the constitutional sense." *Ibid.* The Court of Appeals rejected this contention. It held that Congress has the authority "to establish a higher standard, more protective of minority rights, than constitutional minimums require," and that "Congress intended to permit grant disqualification not only for purposeful discrimination but also for discrimination evidenced simply by an unjustified disparity in staff assignments." *Id.,* at 588. It further concluded that HEW's denial of funding was not arbitrary or capricious. *Id.,* at 589. The several proffered justifications were either inadequate to explain the disparities or were unsupported by facts appearing on the record. *Ibid.*

Because of the importance of the issue, we granted certiorari. *Sub nom. Board of Education of City School Dist.* v. *Califano,* 440 U. S. 905 (1979). The stay preserving the funds remains in effect. See Fed. Rule App. Proc. 41 (b).

## III

Our primary concern is with the intent of Congress. Section 706 sets forth the eligibility criteria for ESAA funding. In subsection (a)(1) it authorizes a grant to a local educational agency that (i) is implementing a desegregation plan approved by a court, or by HEW "as adequate under title VI of the Civil Rights Act of 1964," or (ii), "without having been required to do so," has a plan to eliminate or reduce minority group isolation.

Critical to the resolution of the issue in this case, however, are the *ineligibility* provisions of § 706 (d)(1)(B), quoted above in Part I of this opinion. Ineligibility comes about if the agency either has in effect a practice "which results in the disproportionate demotion or dismissal of . . . personnel from minority groups," *or* "otherwise engage[s] in discrimination . . . in the hiring, promotion, or assignment of employees." The mere reading of this language reveals that it suffers from imprecision of expression and less than careful draftsmanship. The first portion clearly speaks in terms of effect

or impact. The second portion, arguably, might be said to possess an overtone of intent. There is nothing specifically indicating that this difference exists or, if it does, that it was purposefully drawn by Congress. The existence and significance of the difference are important for petitioner Board, for we are concerned here not with "disproportionate demotion or dismissal of . . . personnel," but with racial "discrimination" in the "assignment of employees."

The Board, as a consequence, argues that it was not the aim of Congress to permit HEW to find that an applicant was ineligible for funding because of its staff assignments unless those assignments were purposefully discriminatory and thus violative of the Equal Protection Clause of the Fourteenth Amendment; it follows, says the Board, that disproportionate impact alone, without proof of purposeful discrimination, is insufficient. *Dayton Board of Education* v. *Brinkman,* 433 U. S. 406 (1977); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252 (1977); *Washington* v. *Davis,* 426 U. S. 229 (1976); and *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189 (1973), are cited. The Board, in other words, would have us interpret the assignment clause as one imposing a constitutional standard. It contends that the test under Title VI of the 1964 Civil Rights Act also provides the measure under ESAA of disqualifying discrimination and of ineligibility. It claims that HEW's finding of intentional discrimination erroneously relied upon a foreseeability test, and that, even if such a test were applicable, the finding was based solely on statistical evidence of disparate impact and that such evidence is insufficient.

Respondents, in their turn, preliminarily assert that it is unnecessary to argue about the correctness of HEW's finding on the administrative record, and that it is also unnecessary to pursue the dictum of the Court of Appeals to the effect that Title VI condemns practices having a disparate racial impact, although no purposeful discrimination is shown. See 584 F. 2d, at 589; but see *Parent Assn. of Andrew Jackson High*

*School* v. *Ambach,* 598 F. 2d 705, 715–716 (CA2 1979). Respondents argue that there is no place here for equivocation: under 45 CFR § 185.43 (b)(2) (1978), an agency is ineligible for funding if it has assigned full-time teachers to schools "in such a manner as to identify any of such schools as intended for students of a particular race, color, or national origin." This, it is said, is an objective criterion. Respondents note that the Board's only argument is that on the record no finding properly could be made that the assignment patterns resulted from intentional or purposeful discrimination, and thus, unless the constitutional standard applies, the Board effectively has conceded that the denial of funds was permissible. For the respondents, then, the sole issue is whether the Act authorizes the withholding of funds when the applicant's faculty assignments, although not shown to amount to purposeful racial discrimination violative of the Equal Protection Clause, are not justified by educational needs.

## IV

*Intent* v. *Impact.* The denial of funds to the Board resulted from a violation of HEW's regulation, that is, teacher assignments that served to identify certain schools racially. This led to ineligibility irrespective of whether it was the product of purposeful discrimination. The controversy thus comes down to the question whether that interpretation by regulation is consistent with the governing statute. While perhaps it might be possible to theorize and to parse the language of § 706 (d)(1)(B), as the Board so strongly urges, in such a way as to conclude that impact alone is sufficient for ineligibility with respect to "demotion or dismissal," but intent is necessary with respect to "assignment of employees," we conclude that the wording of the statute is ambiguous. This requires us to look closely at the structure and context of the statute and to review its legislative history. When we do this, we are impelled to a conclusion

adverse to the Board's position here. We hold that impact or effect governs both prongs of the ineligibility provision of § 706 (d)(1)(B). The overall structure of the Act, Congress' statements of purpose and policy, the legislative history, and the text of § 706 (d)(1)(B) all point in the direction of an impact test.

A reading of the Act in its entirety indisputably demonstrates that Congress was disturbed about minority segregation and isolation as such, *de facto* as well as *de jure,* and that, with respect to the former, it intended the limited funds it made available to serve as an enticement device to encourage voluntary elimination of that kind of segregation. The Board acknowledges that the Act was conceived in part to provide "a financial impetus to *de facto* segregated systems to voluntarily desegregate." Brief for Petitioners 22.

That it was effect, and not intent, that was dominant in the congressional mind when ESAA was enacted is apparent from the specific findings set forth in § 702. Congress' concern was stated expressly to be about "minority group isolation and improving the quality of education for all children." The stated purpose of the legislation was the elimination of this isolation. The focus clearly is on actual effect, not on discriminatory intent. Furthermore, the pronouncement of federal policy, set forth in § 703, speaks in terms of national uniformity with respect to "conditions of segregation by race" in the schools. All "guidelines and criteria," presumably including those governing ineligibility, must "be applied uniformly," and "without regard to the origin or cause of such segregation." This, too, looks to effect, not purpose.

There can be no disagreement about the underlying philosophy of the Act. At the time of ESAA's passage, it was generally believed that the courts, when implementing the Constitution, could not reach *de facto* segregation. See, *e. g.,* 117 Cong. Rec. 11519 (1971) (remarks of Sen. Mondale). Congress, apparently, was not then in much of a mood to mandate a change in the status quo. The midground solution found

and adopted was the enticement approach "to encourage the voluntary elimination, reduction, or prevention of minority group isolation," as § 702 (a)(2) of the Act recites. Thus, it would make no sense to allow a grant to a school district that, although not violating the Constitution, was *maintaining* a *de facto* segregated system. To treat as ineligible only an applicant with a past or a conscious present intent to perpetuate racial isolation would defeat the stated objective of ending *de facto* as well as *de jure* segregation.

Other provisions of the Act indicate that an effect test is the Act's rule, not its exception. Section 706 (d)(1)(A) disqualifies an agency that transfers property or makes services available to a private school or system without first determining ("knew or reasonably should have known") that the recipient does not discriminate. Here, plainly, ineligibility results from something other than invidious motive; the applicant is ineligible even when it is merely negligent in failing to discover the character of the recipient's operations. Similarly, § 706 (d)(1)(C), which has to do with the assignment of children to particular classes within a school, provides for ineligibility whenever "any procedure . . . results in the separation of minority group from nonminority group children for a substantial portion of the school day." The only exception is where there is "bona fide ability grouping." These strike us as "effect," not "intent," provisions.[5]

Close analysis of § 706 (d)(1)(B), the specific provision at issue, also convinces us that its focus is on impact, not intent.

---

[5] There is a definite exception to this pattern in § 706 (d)(1)(D). This is conceded by HEW. Brief for Respondents 16. In subsection (D) the statute speaks of any practice "such as limiting curricular or extracurricular activities (or participation therein by children) in order to avoid the participation of minority group children in such activities." This, clearly, is language of intent and motive. But in this context a mere effect test would be out of place and mischievous, for it would automatically condemn every administrative decision not to offer a particular course or program, however benign or however dictated by budgetary exigencies.

The Board concedes, almost inescapably, that with respect to disproportionate demotion or dismissal of personnel, Congress imposed only an objective or disparate-impact test. Brief for Petitioners 25; Tr. of Oral Arg. 5–6. We agree. Unless a solid reason for a distinction exists. one would expect that, for such closely connected statutory phrases, a similar standard was to apply to assignment of employees. The presence of the word "otherwise" in the second portion of § 706 (d)(1)(B) ("or otherwise engaged in discrimination . . . in the . . . assignment of employees"), while perhaps not persuasive in itself alone, is not without significance. It lends weight to the argument that a disparate-impact standard also controls assignment practices.

We also find support for this interpretation in the Report of the Senate Committee on Labor and Public Welfare concerning the Emergency School Aid and.Quality Integrated Education Act of 1971, which was one of the proposed ESAA bills:

> "This clause [the one that later became § 706 (d)(1) (B) of ESAA] renders ineligible any local educational agency which discriminates in its employment practices, and specifically presumes one practice to be discriminatory: the disproportionate demotion or dismissal of instructional or other personnel from minority groups in conjunction with desegregating its schools or establishing integrated schools." S. Rep. No. 92–61, p. 41 (1971).

The words "presumes one practice" are emphasized by the Board, however, and are claimed to indicate that the Senate Committee was making "a significant and conscious distinction between the language of the section which relates to 'demotion or dismissal' and that which relates to 'hiring, promotion or assignment.'" Brief for Petitioners 26.

If there is a distinction between the two phrases, however, it is not inconsistent with the general impact orientation of § 706 (d)(1)(B). For the impact approach itself embraces at least two separate standards: a rebuttable disparate-impact

test and a stricter irrebuttable disproportionate-impact test. To the extent that the "demotion or dismissal" clause sets a higher standard for school boards to meet, it corresponds to the irrebuttable impact test. Indeed, another passage of the Senate Committee Report states:

"For the purposes of this bill, disproportionate demotion or dismissal of instructional or other personnel is considered discriminatory and constitutes *per se* a violation of this provision, when it occurs in conjunction with desegregation, the establishment of an integrated school, or reducing, eliminating or preventing minority group isolation." S. Rep. No. 92–61, at 18–19.

The reference to a *per se* violation strongly suggests that there was to be no excuse for a significant disparity in treatment of the races with respect to demotions or dismissals, *"when [the disparity] occurs* in conjunction with desegregation, the establishment of an integrated school, or reducing, eliminating or preventing minority group isolation." (Emphasis added.) [6] In contrast, the rebuttable impact test governing hiring, promotion, and assignment, permits the school board to justify apparently disproportionate treatment.

Other aspects of the legislative history also are supportive of our interpretation. Not without relevance is the emergence of the so-called "Stennis Amendment," now § 703 (a), that pronounced national policy. The concept of a nationally uniform standard was proposed by Senator Stennis of Mississippi in April 1971 in the debate on the proposed Emergency School Aid and Quality Integrated Education Act of 1971, S. 1557, 92d Cong., 1st Sess. (1971). See 117 Cong. Rec. 11508–11520 (1971). Proponents of the Amendment argued that school districts in the South were being forced to desegregate in order to receive federal emergency assistance, while those elsewhere could continue to receive such assistance despite existing seg-

---

[6] The authors of the Report, of course, were aware of massive firings of black teachers in the South. S. Rep. No. 92–61, at 18.

regation conditions.[7]    Opponents were concerned that the proposed amendment might be read as cutting back on desegregation efforts in States that had segregated their schools by law.[8]    The Stennis Amendment was adopted and was included in the final version of ESAA when it was enacted as Title VII of the Education Amendments of 1972.    Senator Stennis summarized his proposal in the final debate.[9]

---

[7] "The Stennis amendment would provide that there be a national school policy applied equally to all States, localities, regions, and sections of the United States.    The adoption of this amendment would help to eliminate the use of the 'double standard,' which has resulted in the requirements for the integration of the public schools being given a very stringent application in the South and a very lenient application elsewhere.

.            .            .            .            .

"I have never been able to understand how a 10-year-old colored student in a public school in Harlem, Watts, or South Chicago, is expected to look around and see nothing but black faces in his classroom and say to himself: 'This kind of racial separation does not hurt me because the State of Illinois does not have a law requiring me to attend all-black schools. I should not feel hurt by this racial separation because it is the result of housing patterns that just accidentally developed.'"    117 Cong. Rec. 11511–11512 (1971) (remarks of Sen. Eastland).

See also id., at 11508–11510 (remarks of Sen. Stennis).

[8] "What worries me is this: It could be argued, if this became law, that the Attorney General and the Secretary of Health, Education, and Welfare could be told, 'Do not seek a remedy against an instance where there is official discrimination unless you can also tell me how you can uniformly find the same kind of remedy available to eliminate segregation which does not have an official basis.'

"The way it reads, I believe that argument might be made.

.            .            .            .            .

"I fear this amendment could be construed as an endorsement of weakened enforcement throughout this Nation.    The reason why I oppose it . . . is that I fear it will be read as a policy statement calling for a national policy of nonenforcement."    Id., at 11517–11518 (remarks of Sen. Mondale).

See also id., at 11516–11517 (remarks of Sen. Javits).

[9] "That is what the conferees have done and that language speaks for itself.    For the first time, if this conference report is adopted and the bill is signed into law, we will have a uniform national policy in school deseg-

This history of § 703 (a) indicates that the statute means exactly what it says: the same standard is to govern nation-wide, and is to apply to *de facto* segregation as well as to *de jure* segregation.[10]   It suggests ineligibility rules that focus

---

regation matters, North, South, East, and West applied uniformly without regard to the origin or cause of such segregation.   That is the Stennis amendment, pure and simple."   118 Cong. Rec. 18844 (1972).

[10] The dissent suggests that no support for an impact standard is provided by the Stennis Amendment, since that Amendment also applies to Title VI, and Title VI does not incorporate an impact test.   The Stennis Amendment, as enacted, however, was broken into two subsections, with subsection 703 (a) applying to guidelines and criteria under ESAA, and subsection 703 (b) applying to guidelines and criteria under Title VI. The Conference Report on this section explained the distinction:

"The House amendment stated the policy of the United States that guidelines and criteria established *pursuant to this title* shall be applied uniformly in all regions of the United States in dealing with conditions of segregation by race in the schools of the local educational agencies of any State without regard to the origin or cause of such segregation.   The Senate amendment stated the policy of the United States that guidelines and criteria established pursuant to *Title VI of the Civil Rights Act* . . . *and this title* shall be applied uniformly in all regions of the United States in dealing with conditions of segregation by race whether *de jure* or *de facto* in the schools of the local educational agencies of any State without regard to the origin or cause of such segregation.   The conference substitute retains both the Senate and House provisions but deletes the reference in the Senate amendment to this title.   The conference substitute's version of the Senate provision, therefore, restates the policy contained in section 2 (a) of Pub. L. 91–230 and in no way supersedes subsection (b) of such section."   S. Conf. Rep. No. 92–798, pp. 212–213 (1972). (Emphasis added.)

It is clear from this explanation that the House version became § 703 (a), and the Senate version became § 703 (b).   The explanation that the conference version of the Senate provision does not supersede § 2 (b) of Pub. L. 91–230 is critical.   Section 2 of Pub. L. 91–230, 84 Stat. 121, 42 U. S. C. § 2000d–6, provides in relevant part:

"(a) It is the policy of the United States that guidelines and criteria established pursuant to title VI of the Civil Rights Act of 1964 . . . dealing with conditions of segregation by race, whether de jure or de facto, in the schools of the local educational agencies of any State shall be applied

on actualities, not on history, on consequences, not on intent.[11]

The Board's reliance on a colloquy between Congressman Pucinski, ESAA's sponsor in the House, and Congressman Esch does not persuade us otherwise. Mr. Esch inquired whether "the Secretary [will] be authorized to apply the holding in the Singleton case [*Singleton* v. *Jackson Municipal Separate School Dist.*, 419 F. 2d 1211 (CA5 1969), rev'd in part on other grounds *sub nom. Carter* v. *West Feliciana Parish School Bd.*, 396 U. S. 290 (1970)]—which is that you have to have a perfect racial balance in the faculty in every single school in your district—as a condition or requirement for assistance under this program." Mr. Pucinski's response was: "The answer is absolutely not." 117 Cong. Rec. 39332 (1971).

---

uniformly in all regions of the United States whatever the origin or cause of such segregation.

"(b) *Such uniformity refers to one policy applied uniformly to de jure segregation wherever found and such other policy as may be provided pursuant to law applied uniformly to de facto segregation wherever found.*" (Emphasis added.)

Thus, the version of the Stennis Amendment which applies under Title VI, as explained by § 2 (b) of Pub. L. 91–230, is significantly different from the ESAA version of the Stennis Amendment. In view of this difference, it is not at all "wholly incongruous to hold in this case that the Stennis Amendment supports a mere 'disparate impact' reading of the term 'discrimination' in § 706 (d) (1) (B) of ESAA, when only two Terms ago five Members of the Court construed the prohibition against 'discrimination' in federally funded programs under Title VI, which is equally subject to the Stennis Amendment, to incorporate a purposeful-discrimination test," as the dissent asserts, *post*, at 160. Programs funded under Title VI are not "equally" subject to the Stennis Amendment; they are subject to a different version of the Stennis Amendment.

[11] Petitioner Board acknowledges that for funding purposes, the distinction between *de jure* and *de facto* segregation was "erased" in ESAA. Brief for Petitioners 23, 32. But it would tie this erasure only to the *eligibility* standards of § 706 (a) (1) (court-ordered, HEW-approved, or voluntary plan of desegregation) and not to the *ineligibility* criteria of § 706 (d).

We do not so limit or circumscribe the statute. Section 703 (a) applies to all "guidelines and criteria."

While it might be argued that this passing exchange intimates some limit on HEW's ability to require complete elimination of *de facto* segregation as a condition of ESAA eligibility, we do not regard the regulation at issue here as at all inconsistent with the colloquy, and we find no indication in the legislative history that any Member of Congress voted in favor of the amendment in reliance on an understanding that it would weaken the eligibility conditions. See *Cannon* v. *University of Chicago,* 441 U. S. 677, 713–716 (1979). HEW, by its regulation, does not require faculties to be in perfect racial balance. It prohibits only faculty assignments that make schools racially identifiable. That is a much narrower requirement.

Finally, there is some significance in the fact that Congress was aware of HEW's existing regulation when ESAA was re-enacted in 1978. See n. 1, *supra.* The House version included a waiver-of-ineligibility provision to respond to complaints about the application of the regulation to Los Angeles and New York City. See H. R. Rep. No. 95–1137, pp. 95–96 (1978).[12] The waiver provision was dropped in the Conference Committee Report. See H. R. Conf. Rep. No. 95–1753, p. 286 (1978). It is of interest to note that the president of the American Federation of Teachers, as a witness, recommended to the Senate "that the ESAA be *reformed* to require a finding of discrimination, not simply a numerical imbalance, before ESAA funds can be cut off." Education Amendments of 1977, Hearings on S. 1753 before the Subcom-

---

[12] "In an attempt to deal with this problem, the Committee bill adopts an amendment making clear that school districts which are undertaking efforts to integrate their faculty but which have not yet fully achieved that goal may nonetheless obtain a waiver of ineligibility. Presently, the Department of Health, Education, and Welfare is interpreting the law as requiring school districts to complete faculty integration before they can apply for funds. The purpose of this amendment is to assist those school districts while they are trying to achieve that goal."

mittee on Education, Arts and Humanities of the Senate Committee on Human Resources, 95th Cong., 1st Sess., pt. 1, p. 1275 (1977) (emphasis added). No such change, however, was made. This strongly suggests that Congress acquiesced in HEW's interpretation of the statute. See *Andrus* v. *Allard*, *ante*, at 57. *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 275 (1974).

There is no force in the suggestion that a decision adverse to the Board here will serve to harm or penalize the very children who are the objects of the beneficial provisions of the Act. A ruling of ineligibility does not make the children who attend the New York City schools any worse off; it does serve to deny them benefits that in theory would make them better off. The funds competed for, however, are not wasted, for they are utilized, in any event, to benefit other similarly disadvantaged children. It is a matter of benefit, not of deprival, and it is a matter of selectivity.

For these several reasons, we readily conclude that the discrimination that disqualifies for funding under ESAA is not discrimination in the Fourteenth Amendment sense. Disproportionate impact in assignment of employees is sufficient to occasion ineligibility. Specific intent to discriminate is not an imperative. There thus is no need here for the Court to be concerned with the issue whether Title VI of the Civil Rights Act of 1964 incorporates the constitutional standard. See *University of California Regents* v. *Bakke*, 438 U. S. 265 (1978). Consideration of that issue would be necessary only if there were a positive indication either in Title VI or in ESAA that the two Acts were intended to be coextensive. The Board stresses the fact that a desegregation plan approved by HEW as sufficient under Title VI is expressly said to satisfy the eligibility requirements of § 706 (a). The ineligibility provisions of § 706 (d), however, contain additional requirements, and there is no indication that mere compliance with Title VI satisfies them. Nor does the fact that a viola-

tion of Title VI makes a school system ineligible for ESAA funding mean that only a Title VI violation disqualifies.

It does make sense to us that Congress might impose a stricter standard under ESAA than under Title VI of the Civil Rights Act of 1964. A violation of Title VI may result in a cutoff of all federal funds, and it is likely that Congress would wish this drastic result only when the discrimination is intentional. In contrast, only ESAA funds are rendered unavailable when an ESAA violation is found. And since ESAA funds are available for the furtherance of a plan to combat *de facto* segregation, a cutoff to the system that *maintains* segregated faculties seems entirely appropriate. The Board's proffered distinction between funding and eligibility, that is, that a *de jure* segregated system was to be required to desegregate in order to receive assistance, but a *de facto* system was not, contravenes the basic thrust of ESAA. We are not persuaded by the suggestions to the contrary in *Board of Education, Cincinnati* v. *HEW*, 396 F. Supp. 203, 255 (SD Ohio 1975), aff'd in part and rev'd in part on other grounds, 532 F. 2d 1070 (CA6 1976), and in *Bradley* v. *Milliken*, 432 F. Supp. 885, 886–887 (ED Mich. 1977).[13]

[13] We find the reasoning of the District Court in *Robinson* v. *Vollert*, 411 F. Supp. 461, 472–475 (SD Tex. 1976), rev'd, 602 F. 2d 87 (CA5 1979), upon which the Board also relies, clearly distinguishable. This case concerned an attempt by HEW to impose conditions upon the receipt of ESAA funds different from those imposed by a court overseeing court-ordered desegregation. A court-ordered plan is deemed sufficient under Title VI. Elementary and Secondary Education Amendments of 1967, § 112, 81 Stat. 787, 42 U. S. C. § 2000d–5. The court in *Vollert* reasoned that a court-ordered plan also should be deemed in compliance with ESAA. While we do not pass upon the issue, it may be that what constitutes acceptable integration is the same under both Title VI and ESAA, and that HEW may not require a remedy different from that imposed by a court. Even so, that would not mean that what constitutes discrimination is the same under both statutes. ESAA was an attempt by Congress to bring about the same remedy without regard to the cause of the problem, while Title VI may have been intended to remedy the problem only when its cause was intentional discrimination.

*Proof of Impact.* It is unnecessary to indulge in any detailed comment about the proof of impact in this case. The Court of Appeals did not discuss whether the statistical evidence flowing from the 1976 compliance investigation established a prima facie case. This apparently was because petitioners did not challenge the accuracy or sufficiency of respondents' data and statistics, but relied on justifications to explain the statistical disproportions in teacher assignments.

As we have indicated, the disparate-impact test in the second part of § 706 (d)(1)(B) is rebuttable. We conclude, however, that the burden is on the party against whom the statistical case has been made. See *Castaneda* v. *Partida,* 430 U. S. 482, 497–498, and n. 19 (1977); *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 432 (1971). That burden perhaps could be carried by proof of "educational necessity," analogous to the "business necessity" justification applied under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, 42 U. S. C. § 2000e *et seq.;* see, *e. g., Dothard* v. *Rawlinson,* 433 U. S. 321, 329 (1977); *Furnco Construction Corp.* v. *Waters,* 438 U. S. 567, 581–583 (1978) (dissenting opinion).

The Court of Appeals ruled that each of the justifications asserted by petitioners, which included compliance with requirements of state law and collective-bargaining agreements, teacher preferences, unequal distributions of licenses in certain areas, compliance with the provisions of the bilingual-instruction consent decree, and demographic changes in student population, either was insufficient as a matter of law or was not supported by evidence in the record. Petitioners did not contest these conclusions in their petition for a writ of certiorari or in their brief in this Court. Thus, we express no opinion on whether any of the justifications proffered by the Board would satisfy its burden.

## V

In sum, we hold that discriminatory impact is the standard by which ineligibility under ESAA is to be measured, irrespec-

tive of whether the discrimination relates to "demotion or dismissal of instructional or other personnel" or to "the hiring, promotion, or assignment of employees"; that a prima facie case of discriminatory impact may be made by a proper statistical study and, in fact, was so made here; and that the burden of rebutting that case was on the Board.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

MR. JUSTICE STEWART, with whom MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST join, dissenting.

The Court holds that the Emergency School Aid Act of 1972 (ESAA)[1] renders ineligible for ESAA funding any school district whose faculty assignment policies have resulted in racial disparities, even in the total absence of any evidence of intentional racial discrimination. I disagree. It is my view that a school district is ineligible to receive ESAA funds only if it has acted with a racially discriminatory motive or intent in its faculty assignment policies.

I

The controversy in this case turns on the proper construction of § 706 (d)(1)(B) of ESAA, which provides:

"No educational agency shall be eligible for assistance under this chapter if it has, after June 23, 1972—

.        .        .        .        .

"(B) had in effect any practice, policy, or procedure which results in the disproportionate demotion or dismis-

---

[1] 20 U. S. C. §§ 1601–1619. In 1978, Congress re-enacted ESAA with amendments not material here and recodified the statute at 20 U. S. C. §§ 3191–3207 (1976 ed., Supp. II). See Education Amendments of 1978, Title VI, 92 Stat. 2252, 2268. The provision at issue here, former § 706 (d)(1)(B), is now codified at 20 U. S. C. § 3196 (c)(1)(B) (1976 ed., Supp. II). In the interest of consistency with the Court's opinion, all statutory references herein are to the original statutory and Code provisions.

sal of instructional or other personnel from minority groups in conjunction with desegregation or the implementation of any plan or the conduct of any activity described in this section, *or otherwise engaged in discrimination based upon race, color, or national origin in the hiring, promotion, or assignment of employees of the agency. . . ."* (Emphasis added.)

Since the only discriminatory activity alleged in this case involves the assignment of teachers, the inquiry must focus on the second (italicized) clause of § 706 (d)(1)(B). The precise question is what Congress intended when it used the phrase "or otherwise engaged in discrimination."

In deciding that question, the starting point is the language of the statute itself. See, *e. g., Southeastern Community College* v. *Davis,* 442 U. S. 397, 405. That language, as the positions of the parties to this suit confirm, may be read in two different ways. The first, that urged by the respondents and endorsed by the Court, is that the ineligibility standard under the second clause of § 706 (d)(1)(B), like that under the first clause, turns solely on a finding of disparate racial impact. This reading is supported by the argument that the second clause, which renders ineligible for ESAA funding any school district "engaged in discrimination . . . in the hiring, promotion, or assignment of employees" is linked by the word "otherwise" to the first clause, which unambiguously contains a disparate-impact standard. The argument thus is based on the doctrine of *ejusdem generis,* construing the word "otherwise" to mean "in a similar manner" or "similarly." The second way to read the statute, that urged by the petitioners, is to find different ineligibility standards in the two clauses of § 706 (d)(1)(B)—disparate impact alone under the first clause, and discriminatory motive or intent under the second. This reading of the statute is supported by the fact that although the first clause of § 706 (d)(1)(B) is explicitly written in terms of disproportionate

impact, the second clause is framed in terms that, as the Court today perceives, "possess an overtone of intent." [2] *Ante,* at 139. Since the meaning of § 706 (d)(1)(B) is thus concededly ambiguous, it is necessary to look beyond the statutory words in order to ascertain their meaning.

## II

That inquiry may appropriately focus on whether the intent of Congress can be determined from a consideration of the legislative history of § 706 (d)(1)(B) itself, or of other provisions of ESAA.[3]

---

[2] The petitioners also argue that the doctrine of *ejusdem generis* is not appropriately applied in this context inasmuch as the word "otherwise" is not preceded by an enumeration of a number of types of conduct, but rather by a single type of highly particularized conduct. See 2A C. Sands, Statutes and Statutory Construction § 47.17 (4th ed. 1973). In this context, the petitioners argue that the word "otherwise" conveys a sense not of similarity, but of contrast: the section first describes, without regard to motive or intent, disproportionate demotions or dismissals; then, in apparent contrast to the first type of conduct, it describes "discrimination" in the hiring, promotion, or assignment of staff.

[3] The respondents also rely on the "general scheme" of ESAA for its reading of the second clause of § 706 (d)(1)(B) as incorporating no more than a disparate-impact ineligibility standard. This reliance is misplaced. Although one of the concerns of Congress in enacting ESAA was to eliminate minority isolation regardless of its cause, Congress also had in mind other important objectives in enacting the legislation. One such objective was to meet the special educational needs of minority group children from environments in which the dominant language is other than English. See S. Rep. No. 92-61, pp. 22-24 (1971). To attain this objective, Congress earmarked certain ESAA funds for programs to assist these children in developing linguistic skills in both English and the language they speak at home. § 708 (c) of ESAA, 20 U. S. C. § 1607 (c).

The respondents' construction of § 706 (d)(1)(B), if literally applied, could wholly frustrate this congressional purpose by making ineligible for ESAA funds those school districts whose faculty assignment policies have caused racial disparaties resulting from bona fide efforts to meet the special educational needs of non-English-speaking children. In a situation where, for example, a school district is making special efforts to provide bilingual instruction to Spanish-speaking children, it would be hardly

## A

The legislative history of the specific provision in issue reveals that the language that ultimately was enacted in § 706 (d)(1)(B) first appeared in S. 1557, 92d Cong., 1st Sess., a bill reported out of the Senate Committee on Labor and Public Welfare in 1971. In explaining the language at issue here, the Committee noted:

> "The phrase 'disproportionate demotion or dismissal of instructional or other personnel from minority groups' *is not modified or in any way diminished* by the subsequent phrase 'or otherwise engaged in discrimination based upon race, color or national origin,' which renders ineligible local educational agencies which have engaged in other discrimination, including discrimination in hiring, against minority group employees." S. Rep. No. 92–61, p. 19 (1971) (emphasis added).

It is thus apparent that the Senate Committee that drafted the language now appearing in § 706 (d)(1)(B) not only recognized a distinction between the ineligibility standards under the first and second clauses, but also regarded the standard of ineligibility under the first clause as more burdensome to the applicant than the standard under the second.

The purpose of this differentiation is also made clear in the legislative history. Congress singled out staff demotions and dismissals as appropriate for a disparate-impact standard because it was well documented that desegregation activities had in some States resulted in the wholesale firing of Negro faculty members: "HEW statistics indicate that between 1968

---

surprising to find a disproportionate number of Hispanic teachers assigned to schools serving Hispanic students. Yet, if the disparate-impact test were literally applied, this bona fide attempt to advance the goals of ESAA would render the school district ineligible for further ESAA funding. It can hardly be said, therefore, that the overall purposes of ESAA unerringly point to the respondents' reading of the second clause of § 706 (d)(1)(B).

and 1970, in the States within the Fifth Judicial Circuit alone, the number of black teachers was reduced by 1,072, while the number of white teachers increased by 5,575." S. Rep. No. 92–61, *supra*, at 18. These statistics so disturbed Congress that it adopted a *per se* rule of ineligibility for disproportionate demotions or dismissals of Negro faculty members in conjunction with desegregation activities, even at the cost of withholding ESAA funds from school districts that had in no way intentionally discriminated against Negro faculty members.

The legislative history of § 706 (d)(1)(B) thus strongly suggests that the petitioners have advanced the proper interpretation of the statute. This reading of § 706 (d)(1)(B), under which the first clause is governed by disparate impact and the second by motive or intent, is consistent with the fact that Congress not only recognized a distinction between the ineligibility standards under the first and second clauses, but also regarded the standard of ineligibility under the first clause as more burdensome to the applicant than the standard under the second.

Apparently recognizing that the legislative history cannot support a reading of § 706 (d)(1)(B) that gives the same meaning to the ineligibility standards under its first and second clauses, the Court observes:

> "If there is a distinction between the two phrases, however, it is not inconsistent with the general impact orientation of § 706 (d)(1)(B). For the impact approach itself embraces at least two separate standards: a rebuttable disparate-impact test and a stricter irrebuttable disproportionate-impact test. To the extent that the 'demotion or dismissal' clause sets a higher standard for school boards to meet, it corresponds to the irrebuttable impact test." *Ante*, at 143–144.

To draw this distinction between the two clauses is, however, totally at odds with the Court's earlier endorsement of

the respondents' reading of the language of the provision. That reading depends wholly on the proposition that inasmuch as the first clause describes disparate impact, the presence of the word "otherwise" in the second clause "lends weight to the argument that a disparate-impact standard [is] also [the standard of ineligibility under the second clause]." *Ante,* at 143. It should follow that the standard contained in both clauses is the same—that the second clause incorporates the irrebuttable disparate-impact standard embodied in the first. The Court's contrary suggestion that an irrebuttable standard is contained in the first clause, but only a rebuttable standard in the second, is nowhere in the Court's opinion squared with the Court's express agreement with the respondents' reading of the language of § 706 (d)(1)(B).[4]

---

[4] Yet another problem with the Court's conclusion that the second clause of § 706 (d)(1)(B) creates a rebuttable disparate-impact standard is the fact that the Court never explains its later suggestion that an applicant may rebut a prima facie showing of discrimination only by proof of error in the statistics or by an " 'educational necessity' [showing], analogous to the 'business necessity' justification applied under Title VII of the Civil Rights Act of 1964." *Ante,* at 151.

By referring to the "business necessity" justification under Title VII, the Court apparently is construing the term "discrimination" in § 706 (d)(1) (B) by reference to those cases under Title VII which have not required a showing of discriminatory intent on the part of the employer, *e. g., Griggs* v. *Duke Power Co.,* 401 U. S. 424. Under the doctrine of those cases, a Title VII violation may be found if the plaintiff demonstrates that an employment practice has a disparate racial impact and the employer is then unable to justify the practice on the grounds of "business necessity." *Id.,* at 431–432. By analogy to this type of employment discrimination, the Court apparently concludes that the second clause of § 706 (d)(1)(B) renders ineligible any school district whose faculty assignment policies have a disparate racial impact not justified by educational needs.

It is my view, however, that this category of Title VII cases has no bearing on the meaning of the term "discrimination" in the second clause of § 706 (d)(1)(B). Our cases make clear that the theory of "disparate impact" under Title VII is a gloss on the specific statutory language of §§ 703 (a)(2) and 703 (h) of Title VII, see *General Electric Co.* v. *Gil-*

The fact of the matter is that the legislative history simply belies the respondents' reading of the statutory language. That history strongly supports the conclusion that, while the first clause of § 706 (d)(1)(B) incorporates a disparate-impact standard, the second clause makes ineligibility depend upon discriminatory motive or intent.

## B

The other provisions of ESAA, and particularly the so-called Stennis Amendment, do not, it seems to me, support the weight the Court places upon them.[5]

---

*bert,* 429 U. S. 125, 137; *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 425, n. 21; *Griggs* v. *Duke Power Co., supra,* at 426, n. 1. Under § 703 (a)(2), it is an unlawful employment practice for an employer

"to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2 (a)(2).

Section 703 (h) provides that it is not unlawful for an employer

"to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin," 42 U. S. C. § 2000e–2 (h).

The language of these provisions quite plainly does not track that in § 706 (d)(1)(B), for § 703 (a)(2) fails even to include the term "discrimination," and while the term does appear in § 703 (h), it is expressly modified—"*used* to discriminate"—in such a manner as to incorporate a disparate-impact test. Since the language of §§ 703 (a)(2) and 703 (h) of Title VII in no way resembles that at issue here, those provisions are obviously not an appropriate guide to the definition of "discrimination" under § 706 (d)(1)(B).

If there is an appropriate analogy to Title VII, it is a quite different one. See Part III of this opinion.

[5] The Court also finds support for its reading of § 706 (d)(1)(B) in the fact that at least two of the three other ineligibility provisions in § 706 (d)(1) do not require a showing of intent. Accordingly, the Court notes that "an effect test is the Act's rule, not its exception." *Ante,* at 142.

Even putting aside doubts as to the validity of the premise of this

The Stennis Amendment, enacted as § 703 of ESAA, 86 Stat. 354, provides:

"(a) It is the policy of the United States that guidelines and criteria established pursuant to [ESAA] shall be applied uniformly in all regions of the United States in dealing with conditions of segregation by race in the schools of the local educational agencies of any State without regard to the origin or cause of such segregation.

"(b) It is the policy of the United States that guidelines and criteria established pursuant to title VI of the Civil Rights Act of 1964 . . . shall be applied uniformly in all regions of the United States in dealing with conditions of segregation by race whether de jure or de facto in the schools of the local educational agencies of any State without regard to the origin or cause of such segregation."

The Court concludes that the Stennis Amendment and its legislative history "indicat[e] that the statute means exactly what it says: the same standard is to govern nationwide, and is to apply to *de facto* segregation as well as to *de jure* segregation. It suggests ineligibility rules that focus on actualities, not on history, on consequences, not on intent." *Ante,* at 146–147 (footnotes omitted).

My difficulty with this reasoning stems from the fact that the Stennis Amendment is applicable not only to ESAA, but also to Title VI of the Civil Rights Act of 1964, and the latter has been construed to contain not a mere disparate-impact

argument (namely, that a statutory provision should be construed in accordance with the majority of arguably related provisions), the Court's tally of these other provisions is extremely questionable. In short, it seems clear that the ineligibility standard of § 706 (d)(1)(A) does not, as the Court suggests, amount to an "effect" test. That provision by its own terms rather plainly requires at least a showing of negligence before a school district is rendered ineligible for ESAA funding.

standard, but a standard of intentional discrimination. In *University of California Regents* v. *Bakke,* 438 U. S. 265, five Members of the Court concluded that Title VI, which prohibits discrimination in federally funded programs, prohibits only discrimination violative of the Fifth Amendment and the Equal Protection Clause of the Fourteenth. *Id.,* at 281–287 (POWELL, J.); *id.,* at 328–355 (BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.). Those constitutional provisions, in turn, have been construed to reach only purposeful discrimination. *Dayton Board of Education* v. *Brinkman,* 433 U. S. 406; *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252; *Washington* v. *Davis,* 426 U. S. 229; *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189. It thus follows from *Bakke* that Title VI prohibits only purposeful discrimination.

It is wholly incongruous to hold in this case that the Stennis Amendment supports a mere "disparate impact" reading of the term "discrimination" in § 706 (d)(1)(B) of ESAA, when only two Terms ago five Members of the Court construed the prohibition against "discrimination" in federally funded programs under Title VI, which is equally subject to the Stennis Amendment, to incorporate a purposeful-discrimination test. If Congress in fact intended the Stennis Amendment to establish a uniform national standard prohibiting action leading to disparate racial impact, then it is difficult to understand why this standard should not govern Title VI as well as § 706 (d)(1)(B).[6]

---

[6] In response, the Court argues that Congress enacted two different versions of the Stennis Amendment. *Ante,* at 146–147, n. 10. This argument is premised on the fact that the Conference Report indicated that § 703 (b), the section of the Stennis Amendment applicable to Title VI, was intended to restate and not to supersede a provision in Title VI, 42 U. S. C. § 2000d–6, which provides:

"(a) It is the policy of the United States that guidelines and criteria established pursuant to Title VI of the Civil Rights Act of 1964 . . . dealing with conditions of segregation by race, whether de jure or de facto, in

## III

The conclusion that ineligibility under the second clause of § 706 (d)(1)(B) depends upon a showing of a school district's purposeful discrimination is persuasively supported by the interpretations that have been given to analogous provisions of Title VI and Title VII of the Civil Rights Act of 1964. When Congress enacted ESAA in 1972, it was not writing on a clean slate. To the contrary, when Congress left undefined the term "discrimination" in the second clause of § 706 (d)(1)(B), it had already enacted both Title VI of the 1964 Act, which provides that "[n]o person . . . shall . . . be subjected to *discrimination* under any program or activity receiving Federal financial assistance," [7] and § 703 (a)(1) of Title VII of that Act, which provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to *discriminate* against any individual . . . because of such individual's race, color, religion, sex, or national origin." [8] These provisions are, in the absence of any explicit definition of "discrimination" in ESAA or its legislative history, a useful guide in determining what Congress intended when it concluded that school districts "engaged in discrimination" should be ineligible to receive ESAA funds.

---

the schools of the local educational agencies of any State shall be applied *uniformly* in all regions of the United States whatever the origin or cause of such segregation.

"(b) *Such uniformity refers to one policy applied uniformly to de jure segregation wherever found and such other policy as may be provided pursuant to law applied uniformly to de facto segregation wherever found.*" (Emphasis added.)

The flaw in this argument is that the Conference Committee in no way indicated, as the Court seems to suggest, that § 703 (a), the section of the Stennis Amendment applicable to ESAA, was to be construed any differently than § 703 (b).

[7] 42 U. S. C. § 2000d (emphasis added).

[8] 42 U. S. C. § 2000e–2 (a)(1) (emphasis added).

Title VI and § 703 (a)(1) of Title VII point clearly toward the necessity of finding discriminatory motive or intent in order to hold a school district ineligible under the second clause of § 706 (d)(1)(B).[9] Title VI, as already pointed out, has been construed to prohibit only discrimination violative of the Fifth Amendment or the Equal Protection Clause of the Fourteenth, *University of California Regents* v. *Bakke,* 438 U. S., at 281–287 (POWELL, J.); *id.,* at 328–355 (BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.); and, in turn, those constitutional provisions have been construed to prohibit only purposeful discrimination, *Dayton Board of Education* v. *Brinkman, supra; Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra; Washington* v. *Davis, supra; Keyes* v. *School Dist. No. 1, Denver Colo., supra.* And, in construing § 703 (a)(1) of Title VII, which, at its core, prohibits an employer from "treat[ing] some people less favorably than others because of their race, color, religion, sex, or national origin," *Teamsters* v. *United States,* 431 U. S. 324, 335, n. 15, we have held that "[p]roof of discriminatory motive is critical," *ibid.* Accord, *Furnco Construction Corp.* v. *Waters,* 438 U. S. 567, 579–580; *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 805, n. 18.[10]

---

[9] There may be a difference between the standard of Title VI and that of § 703 (a)(1) of Title VII. But it is clear that a finding of discrimination under either provision ultimately depends upon a finding of either discriminatory motive or discriminatory intent.

[10] Because direct proof of an illicit motive is often unavailable, the cases under § 703 (a)(1) have established a procedural mechanism under which an employer, once an employee has adduced sufficient evidence to give rise to an inference of a discriminatory motive, must bear the burden of establishing that he acted for "a legitimate, non-discriminatory reason." If the employer meets that burden, then the employee must show that the proffered explanation is in fact a pretext. *Furnco Construction Corp.* v. *Waters,* 438 U. S., at 575–577; *Teamsters* v. *United States,* 431 U. S., at 357–360; *McDonnell Douglas Corp.* v. *Green,* 411 U. S., at 800–805. This procedural mechanism is simply designed to provide a means of inferring an employer's motive in the absence of direct evidence. See *Furnco Construction Corp.* v. *Waters, supra.*

If the term "discrimination" in § 706 (d)(1)(B) was in fact intended to mean something other than what it means under Title VI and § 703 (a)(1) of Title VII, Congress could have been expected to state the difference in explicit terms. Since there is no such expression of congressional intent, it follows that the meaning of the term "discrimination" under § 706 (d)(1)(B) should be no different from its established meaning under Title VI and § 703 (a)(1) of Title VII.[11]

For all these reasons, I respectfully dissent.

---

[11] The Court finds support for its interpretation of § 706 (d)(1)(B) in the fact that Congress, though aware that HEW had construed the section to incorporate a disparate-impact test, re-enacted it without change in 1978. *Ante,* at 148–149. This inaction by Congress, in the Court's view, "strongly suggests that Congress acquiesced in HEW's interpretation of the statute." *Ante,* at 149.

This argument might have force if the Court today construed § 706 (d) (1)(B) the way HEW interpreted it in 1978. But the Court has not done so. The HEW regulation implementing § 706 (d)(1)(B) provides, as it did in 1978, that:

"No educational agency shall be eligible for assistance under the Act if, after June 23, 1972, it has had or maintained in effect any other practice, policy, or procedure which results in discrimination on the basis of race, color, or national origin in the recruiting, hiring, promotion, payment, demotion, dismissal, or assignment of any of its employees . . . , including the assignment of full-time classroom teachers to the schools of such agency in such a manner as to identify any of such schools as intended for students of a particular race, color, or national origin." 45 CFR § 185.43 (b)(2).

By lumping together "demotions and dismissals," on the one hand, with employee "assignments," on the other, the HEW regulation rather clearly equates the ineligibility standard of the second clause of § 706 (d)(1) (B) with the irrebuttable disparate-impact standard of the first clause. By contrast, the Court says that the ineligibility standards under the two clauses substantially differ. *Ante,* at 143–144. Since the Court departs from HEW's 1978 interpretation of § 706 (d)(1)(B), it is hard to see how the failure of Congress to overturn that interpretation lends support to the Court's different construction of the section in its opinion today.